## Case No. 9,498.

### The METEOR.[1]

District Court, S. D. New York. March 14, 1866.[2]

VIOLATION OF NEUTRALITY LAWS — FITTING OUT VESSEL — CONSTRUCTION OF STATUTES — ADMISSIBILITY OF EVIDENCE — RES GESTAE — PRESUMPTIONS.

[1. Where a libel of forfeiture is filed against a vessel under the act of 1818 (3 Stat. 448), on the ground that she was fitted out, or attempted to be fitted out, to cruise against a nation with which the United States are at peace, the suit is solely against the vessel herself, and the court is not concerned with the question, who are her real owners? Held, therefore, that where exceptions were filed to the claim on the ground that the persons claiming to be owners of the vessel were not her sole, true, and lawful owners, the court was under no obligations to try this issue before going into the merits of the libel, as it was wholly immaterial to the case.]

[2. A libel or forfeiture against a vessel which has been seized upon water navigable from the sea is a civil cause, of admiralty and maritime ju-

risdiction, and must be tried to the court sitting as a court of admiralty, without a jury.]

[3. In order to condemn a vessel for violation of the neutrality laws, it is not necessary that any person should be first convicted of the crime of fitting out and arming her, or attempting to do so, for the purpose of cruising against any foreign country with which the United States are at peace. Nor is it necessary that there should be satisfactory evidence, produced under the libel of condemnation, of the commission of the personal offence by some person whose action concerning the vessel can, from his relation to it or to its owners, be imputed to the owners as their actions. On the contrary, it need not be shown that the owners were concerned in any violation of the law. All that is required is proof that the vessel was fitted out and armed, or attempted to be fitted out and armed, by some person or persons, with the unlawful intent, but their individuality or identity need not be shown.]

[4. To subject the vessel to forfeiture, it is not necessary that she should have been actually fitted out and armed in the United States, but it is sufficient if any person has been engaged, within the United States, directly or indirectly, in preparing the vessel with the intent that she should be employed in committing hostilities against a power with which the United States are at peace, whether the intent was to arm her in the United States or elsewhere.]

[5. The act of 1818 being clear and unambiguous on its face, the court will not look, for the purpose of interpreting it, to any arguments drawn from the history of the neutrality legislation of the United States, the condition of foreign relations, the political correspondence of the public authorities, or to the discussion in congress preliminary to its passage.]

[6. A certificate by the secretary of state of the United States, under his hand and the seal of the department, certifying that, from authentic information on file in his department, it appears that a state of war has existed from a given date between certain foreign nations, that the United States are at peace with both of them, and that a certain person named is the recognized consul for one of these nations in a certain port of the United States, is competent evidence, under the act of September 15, 1789, to prove the facts therein stated. And it is competent, also, under this act, to prove a declaration of war by one foreign nation against another by means of a translation, certified by the secretary in the same manner, of a document officially communicated to that department, which document is the promulgation by one of these foreign nations of its declaration of war.]

[7. It is within the discretion of a court of admiralty to permit amendments to a libel of forfeiture, even after the evidence is all in and the arguments thereon have been completed, in matters of substance as well as of form, when public justice and the substantial merits of the controversy require it, the only limitation being that such amendments shall not introduce any new res or subject of litigation.]

[8. Where a number of persons were associated together, according to a common plan, in an attempt to fit out and arm a vessel contrary to the neutrality laws, held, that certain testimony given by these persons, which was of a hearsay or secondary character, was admissible as declarations in reference to the common object, and as forming part of the res gestae.]

[9. Where the evidence on the part of the government creates a well-grounded suspicion that the vessel was intended to be fitted out and armed for the unlawful purpose mentioned in the statute, the failure of the claimants to put in any evidence explaining the suspicious circumstances must lead to the condemnation of the vessel.]

---

1 [Not previously reported. 1 Am. Law Rev. 401, contains a partial report.]
2 [Reversed in Case No. 15,760.]

[This was a libel of forfeiture filed by the United States against the steamship Meteor because of an alleged violation of the neutrality act of April 20, 1818 (3 Stat. 448).]

Samuel G. Courtney, Asst. U. S. Dist. Atty., for the United States.

William M. Evarts and Joseph H. Choate, for claimants.

BETTS, District Judge. In directing, on the 13th of July last, the entry of a decree condemning and forfeiting the vessel, her tackle, &c., in this case, the court appended to the decree, as signed, a memorandum to the effect that it would proceed as early after the entry of the decree as might comport with the health and physical ability of the judge, to place on file, in connection with the decree, the positions of law and fact governing the judgment of the court in the decision thus rendered. The intention thus expressed will now be fulfilled.

The libel of information in this case is filed by the attorney of the United States for this district, on behalf of the United States, against the steamship Meteor, under seizure by the marshal of the district, and her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores which may have been procured for the building and equipment thereof, in a cause of seizure and forfeiture. The original libel was filed on the 23d of January, 1866. A monition was issued thereupon, on the same day, against the vessel, her engines, tackle, &c., returnable on the 13th of February, 1866. The monition was duly served on the day of its issue, by an attachment of the vessel, her engines, tackle, &c., by the marshal, and by the giving of due notice to all persons claiming the same.

On the 24th of January, 1866, an amended libel was filed, setting forth more particularly the alleged causes of action. The cause of action set forth in the original libel was simply that the vessel had been fitted out to commit hostilities against the government of Spain, in violation of the neutrality act of congress of 1818 [3 Stat. 447]. The amended libel states (1st) that the vessel "is now lying in the port of New York, on waters navigable from the sea by vessels of the burden of ten tons and upwards, within the Southern district of New York, and within the jurisdiction of this court, and is ready to sail for certain places to the attorney of the United States unknown, with intent to cruise and commit hostilities, in the service of the government of Chile, against the subjects, citizens, and property of the government of her majesty the queen of Spain, with whom the United States are at peace"; (2d) that the vessel "has, on the 23d day of January, 1866, within the limits of the United States, to wit, at the Southern district of New York aforesaid, been fitted out and armed by certain persons to the said attorney unknown, with intent that such steamship or vessel should be employed in the service of the agents of the government of Chile, to commit hostilities against the subjects, citizens, and property of the aforesaid government of Spain, with which the United States then were, and now are, at peace, as aforesaid"; (3d) that the vessel "has, on the 23d day of January, 1866, within the limits of the United States, to wit, at the Southern district of New York aforesaid, been fitted out by certain persons to the said attorney unknown, with intent that such steamship or vessel should be employed in the service of some persons to the said attorney unknown, to commit hostilities against the subjects, citizens, and property of the said government of Spain, with which the United States then were, and now are, at peace as aforesaid"; (4th) that the said vessel "has, on the day and year aforesaid, and at the place aforesaid, and within the limits of the United States as aforesaid, been attempted to be fitted out by certain persons to the said attorney unknown, with intent that such steamship or vessel should be employed in the service of some persons to the said attorney unknown, to commit hostilities against the subjects, citizens and property of said government of Spain, with which the United States are at peace"; (5th) "that certain persons whose names are to the said attorney unknown, on the day and year aforesaid, and at the place aforesaid, and within the limits of the United States, were knowingly concerned in the furnishing and fitting out of the said steamship or vessel, with knowledge and intent that such steamship or vessel should be employed in the service of some persons to the said attorney unknown, to commit hostilities against the subjects, citizens, and property of the said government of Spain, with which the United States were, and now are, at peace"; (6th) "that all and singular the matters hereinbefore secondly, thirdly, fourthly, and fifthly articulated, are all and each of them contrary to the third section of the act of congress approved April 20th, 1818, entitled 'An act for the punishment of certain crimes against the United States, and to repeal the acts therein mentioned'"; and that, by reason of the premises and by virtue of the said act, the said steamship, her tackle, &c., and arms, &c., became forfeited. The prayer of the amended libel is as follows: "Wherefore, the said attorney of the United States, on behalf of the said United States, prays the usual process and monition of this honorable court against the said steamship, now under seizure by the marshal of this district aforesaid, and her tackle, apparel, furniture, arms, and ammunition, in this behalf to be made, and that all persons interested in the said steamship and her tackle, apparel, furniture, arms, and ammunition aforesaid, may be cited to answer the premises, and that, all due proceedings being had thereon, this honorable court may be pleased to decree for the forfeiture aforesaid, and that the said steamship

Meteor and her tackle, &c., and arms and stores aforesaid, may be condemned for the use of the United States, according to the said act of congress," &c.

On the 13th of February, 1866, William F. Cary filed a claim to the vessel, her tackle, &c., which was subscribed by him and duly sworn to. The claim is in the words following: "And now William F. Cary, of the city of New York, merchant, intervening as agent for the interest of Robert B. Forbes and John M. Forbes, of Boston, in the state of Massachusetts, in the said steamship, her tackle, &c., appears before this honorable court, and makes claim to the said steamship, &c., &c., as the same are attached by the marshal, under process of this court, at the instance of the United States, and the said William F. Cary doth aver that he was in possession of the said steamship, &c., at the time of the attachment thereof, and that the persons above named are the true and bona fide sole owners of the said steamship, &c., and that no other person is the owner thereof, and the said Cary was and is the true and lawful bailee thereof, as agent and consignee; wherefore he prays to defend accordingly." On the same 13th of February, 1866, the said claimant, William F. Cary, filed his answer to the libel. The answer is as follows: "The answer of William F. Cary, of the city of New York, intervening for the interest of his principals, Messrs. John M. Forbes and Robert B. Forbes, of Boston, in the state of Massachusetts, to the libel of information of Daniel S. Dickinson, attorney of the United States for the Southern district of New York, who prosecutes on behalf of the said United States, against the said steamship Meteor, her tackle, apparel and furniture, in a cause of seizure and forfeiture, alleges as follows: First, the said respondent admits that the said steamship Meteor is now, and was at the time of her seizure, lying in the port of New York, within the Southern district of New York, and within the jurisdiction of this court, and that, at the time of her seizure, she was ready to go to sea. Second, but the said respondent denies each and every other allegation in the said libel contained, and avers that the same are untrue, and he denies that by reason of the premises in the said libel set forth, or for any other cause, the said steamship, her tackle, &c., became or is forfeited, or subject to forfeiture. Wherefore the said respondent prays that the said libel may be dismissed with costs, and that the said steamship, her tackle, &c., may be restored to the possession of this respondent, as the agent of her said owners."

On the 15th of February, 1866, the attorney of the United States filed exceptions to the claim. The exceptions allege "that the said Robert B. Forbes and John M. Forbes were not at the time of the forfeiture alleged, in the libel aforesaid, and are not now, the sole, true and lawful owners of the said steamship Meteor, her tackle, &c., in manner and form as the said Robert B. Forbes and John M. Forbes have above claimed"; and the exceptions pray that the claim may be dismissed.

On the 26th of March, 1866, the cause, being upon the calendar for trial, was called in its order. The attorney of the United States insisted before the court that the hearing on the exceptions to the claim must be brought on before the trial of the issue raised by the answer to the libel, and that the affirmative upon the allegations made in the claim was cast upon the claimant. The counsel for the claimant controverted this position, and claimed that the attorney of the United States should proceed to trial upon the issue raised by the answer to the libel, and produce proofs in support of the libel, or submit to a decree dismissing it. The court decided that no triable issue had been framed on the exceptions to the claim; that any issue which might be framed on such exceptions would be an immaterial issue; that the suit was one in rem, prosecuted solely against a vessel and her appurtenances under seizure, and not a suit in personam, in any manner affecting personally the claimant, or the principals represented by him; that the court possessed no authority or jurisdiction over or in respect to the claimant or his principals, otherwise than through and by means of the res itself; and that the trial of the cause must proceed on the issue raised by the libel and the answer. It was accordingly proceeded with upon that issue.

The counsel for the claimant then insisted that the court, sitting as a court of admiralty, was incompetent to adjudge the cause and give the relief prayed for in the libel, and that the case must be tried by a jury, and moved that a jury be summoned and impannelled to try it. The court decided that the case was one of the seizure of a vessel upon waters navigable from the sea by vessels of ten or more tons burden, for a breach of the law of the United States, and was a civil cause, of admiralty and maritime jurisdiction, and was within the cognizance of this court, sitting as a court of admiralty, and must be tried without a jury. The jurisdiction of the courts of admiralty of the United States, in cases like the present, is unquestionable, and is based upon constitutional and statutory authority, and settled by judicial decisions of long standing. Const. U. S. art. 3, § 2; Act Sept. 24, 1789, § 9 (1 Stat. 77); Glass v. The Betsey, 3 Dall. [3 U. S.] 6; Penhallow v. Doane, Id. 54; U. S. v. La Vengeance, Id. 297; U. S. v. The Betsey, 4 Cranch [8 U. S.] 443; Whelan v. U. S., 7 Cranch [11 U. S.] 112; U. S. v. The Little Charles [Case No. 15,612]. The four cases of The Slavers, 12 Wall. [69 U. S.] 350–403, were all libels of information filed in the district court in admiralty. Those cases were all carried by appeal to the supreme court, and in all of them the vessels were condemned and forfeited for vio-

lations of the acts against the slave-trade, without any question being raised by either the court or counsel as to the jurisdiction of the district court in admiralty.

The counsel for the claimant then insisted that the libel must be dismissed for the reason that under the third section of the act of April 20, 1818, upon which the libel is founded, an indictment and conviction of the person or persons committing the offence named in that section is a necessary prerequisite to a decree for the forfeiture of the vessel. It was admitted by the attorney of the United States that there had been no such indictment or conviction. The third section of the act of April 20, 1818 (3 Stat. 448), enacts "that if any person shall, within the limits of the United States, fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or shall knowingly be concerned in the furnishing, fitting out, or arming of any ship or vessel, with intent that such ship or vessel shall be employed in the service of any foreign prince or state, or of any colony, district or people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any colony, district or people with whom the United States are at peace, or shall issue or deliver a commission within the territory or jurisdiction of the United States, for any ship or vessel, to the intent that she may be employed as aforesaid, every person so offending shall be deemed guilty of a high misdemeanor, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years; and every such ship or vessel, with her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores, which may have been procured for the building and equipment thereof shall be forfeited, one half to the use of the informer, and the other half to the use of the United States." The court ruled that such previous conviction or indictment is not necessary under the statute, and denied the motion of the claimant to dismiss the libel.

As this question in regard to the necessity of a prior conviction of some person upon an indictment for violation of the third section of the act of 1818, before a condemnation of the offending vessel can be had, was much debated on the trial, it is deemed proper to state somewhat at length the reasons for the decision made by the court that such prior conviction is not necessary. The counsel for the claimant, in summing up the case before the court, after the evidence had all been put in, somewhat modified the views he had previously urged as to the necessity of a prior conviction of some person under the act, and maintained that, under the third section, the forfeiture of the vessel follows as a consequence of the completion of the offence forbidden by that section, and only as such consequence; that, before the

vessel can be forfeited, there must either be an ascertained conviction of some person for the commission of the offence in question, or else there must be, on the trial of the issue raised by the libel and answer, satisfactory evidence of the commission by some person of the personal offence; and that such person must be some one whose action concerning the vessel can, from his relation to the vessel or its owners, be imputed to the owners as their action.

The positions thus maintained by the counsel for the claimant overlook the clearly marked distinction between a forfeiture resulting from a seizure under the admiralty and maritime jurisdiction of the courts of the United States, and a forfeiture resulting from a conviction and judgment in a court of law. This clearly marked distinction is founded upon the character of a proceeding in rem in the admiralty. The proceeding in the present case is wholly one in rem, and the character of such a proceeding is nowhere more accurately defined than in the opinion of Chief Justice Marshall in the case of U. S. v. The Little Charles [Case No. 15,612]. The vessel in that case was seized, as forfeited to the United States, for a violation of the embargo laws of December 22, 1807, and January 9, 1808 (2 Stat. 451, 453). A libel was filed against her, alleging that she departed from a port of the United States to a foreign place, with a cargo on board, contrary to the provisions of the embargo laws, and that she had therefore become forfeited to the United States, and had been seized within the jurisdiction of the court, as forfeited, and it prayed for a decree of forfeiture. On the trial of the cause, the district court rejected as testimony the report and manifest of the cargo of the vessel, signed by the master, as incompetent evidence, upon the ground that the ex parte oath of the master thereto could not be read as evidence in the cause, he being no party to it. On an appeal taken by the United States to the circuit court, an objection was made to the admissibility in evidence of the report and manifest, with the oath of the master, upon the ground that the case was a criminal case, and that the declarations of the master could not affect the vessel or the owners. Upon this point Chief Justice Marshall says: "The argument that in criminal cases no authority can be given, that the character of principal and agent disappears, and the parties become accomplices, will not be controverted. If this was a prosecution against the owner personally, and the confession of the master was adduced, to prove that he acted under the authority of the owner, the argument would be entitled to great consideration. But this is not a proceeding against the owner, it is a proceeding against the vessel, for an offence committed by the vessel, which is not less an offence, and does not the less subject her to forfeiture, because it was committed without

the authority, and against the will of the owner. It is true that inanimate matter can commit no offence. The mere wood, iron, and sails of the ship cannot, of themselves, violate the law. But this body is animated and put in action by the crew, who are guided by the master. The vessel acts and speaks by the master. She reports herself by the master. It is therefore, not unreasonable that the vessel should be affected by this report. But this vessel is the property of another, and his property, it is said, ought not to be wrested from him by evidence which would be inadmissible in an ordinary question concerning property. The court thinks otherwise. The master is selected by the owner, as his agent, for the purpose, among others, of reporting the vessel on her coming into port. The report is not a criminal act, but one prescribed by law. It must state truly the voyage, and, however criminal that voyage may be, in reporting it, the master is in the precise line of his duty, and in the execution of an authority inseparable from his character as master. This report, then, which is in tne very terms prescribed by law, contains, according to the mandate of the law, an averment of the place from which the vessel last sailed. This averment, then, the owner has authorized the master to make for him; and although he may certainly be permitted to controvert it, the court deems it prima facie evidence of the fact. Such evidence has often been considered in the supreme court sufficient to warrant a forfeiture in the absence of that testimony which would be in the power of the claimant, if innocent, and was so considered in the case of The Aurora, 7 Cranch [11 U. S.] 382." The circuit court reversed the decree of the district court, and condemned the vessel.

A proceeding in rem against a vessel or other thing for a forfeiture, because of the violation of a statute of the United States, is an entirely distinct proceeding from a prosecution of a person through whose agency or procurement the offence has been committed; and it is well settled that no conviction of any person for the offence is necessary to warrant a condemnation of the res. This was decided by the supreme court in the case of The Palmyra, 12 Wheat. [25 U. S.] 1. That was a libel of information against the vessel to forfeit her for a piratical aggression committed in violation of the acts of congress of March 3, 1819, and May 15, 1820 (3 Stat. 510, 600). The district court restored the vessel without damages for the capture. The circuit court, on appeal, affirmed so much of the decree as acquitted the vessel, and reversed so much of it as denied damages, and itself awarded damages. The United States and the captors appealed to the supreme court, and the objection was there taken by the appellees that the offenders were not alleged in the libel to have been convicted upon any prosecution in personam, of the offence charged in the libel, and that there must be a due conviction, upon a prosecution and indictment for the offence in personam, averred and proved, in order to maintain the libel in rem. Upon this point Mr. Justice Story, in delivering the opinion of the court, says: "It is well known, that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the crown. The forfeiture did not, strictly speaking, attach in rem; but it was in part or at least a consequence of the judgment of conviction. It is plain from this statement, that no right to the goods and chattels of the felon could be acquired by the crown by the mere commission of the offence; but the right attached only by the conviction of the offender. The necessary result was, that in every case where the crown sought to recover such goods and chattels it was indispensable to establish its right by producing the record of the judgment of conviction. In the contemplation of the common law, the offender's right was not divested until the conviction. But this doctrine never was applied to seizures and forfeitures created by statute, in rem, cognizable on the revenue side of the exchequer. The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing; and this, whether the offence be malum prohibitum or malum in se. The same principle applies to proceedings in rem, on seizures in the admiralty. Many cases exist, where the forfeitures for acts done attach solely in rem, and there is no accompanying penalty in personam. Many cases exist where there is both a forfeiture in rem and a personal penalty. But in neither class of cases has it ever been decided that the prosecutions were dependent upon each other. But the practice has been, and so this court understand the law to be, that the proceeding in rem stands independent of, and wholly unaffected by, any criminal proceeding in personam. This doctrine is deduced from a fair interpretation of the legislative intention apparent upon its enactments. Both in England and America the jurisdiction over proceedings in rem is usually vested in different courts from those exercising criminal jurisdiction. If the argument at the bar were well founded, there could never be a judgment of condemnation pronounced against any vessel coming within the prohibitions of the acts on which the present libel is founded; for there is no act of congress which provides for the personal punishment of offenders who commit 'any piratical aggression, search, restraint, depredation, or seizure,' within the meaning of those acts. Such a construction of the enactments which goes wholly to defeat their operation, and violates their plain import, is utterly inadmissible. In the judgment of this court, no personal conviction of the offender is necessary to enforce a forfeiture in rem, in cases of this nature."

In the Case of the Embargo Laws, the third section of the act of January 9, 1808 (2 Stat.

454), provided, in addition to the forfeiture of any vessel which should violate the law, that the master of the vessel and all persons knowingly concerned in the prohibited voyage should forfeit and pay for every offence, a sum not exceeding twenty thousand dollars nor less than one thousand dollars, "whether the vessel be seized and condemned or not." In the case of the piratical aggressions there was no provision made by the statutes for the personal punishment of the offenders. But, as is said by Mr. Justice Story, in his opinion just quoted in the case of The Palmyra, it has never been held that the prosecutions were dependent upon each other in either class of cases, that is, whether the forfeiture for the act done attaches solely in rem, without any accompanying penalty in personam, or whether there is both a forfeiture in rem and a personal penalty prescribed by the statute. This doctrine was affirmed by the supreme court in the case of U. S. v. The Malek Adhel, 2 How. [43 U. S.] 210, which was a libel in rem against the vessel and her cargo for a violation of the piracy act of March 3, 1819 (3 Stat. 510). In that case it was admitted at the trial that the owners of the vessel never contemplated or authorized the piratical acts complained of, and it was contended before the supreme court that the property was not liable to condemnation, because the owners neither participated in nor authorized the piratical acts. Upon this point, Mr. Justice Story, in delivering the opinion of the court, says: "The next question is whether the innocence of the owners can withdraw the ship from the penalty of confiscation under the act of congress. Here again it may be remarked that the act makes no exception whatsoever, whether the aggression be with or without the co-operation of the owners. The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. The vessel or boat (says the act of congress) from which such piratical aggression, &c., shall have been first attempted or made, shall be condemned. Nor is there anything new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel, in which or by which, or by the master or crew thereof, a wrong or offence has been done, as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party. The doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws, and has been applied to other kindred cases, such as cases arising on embargo and non-intercourse acts. In short, the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." The judge then cites, as authority for these positions, the cases of U. S. v. The Little Charles [supra] and The Palmyra [supra] and adds: "The same doctrine has been fully recognized in the high court of admiralty in England, as is sufficiently apparent from the Vrouw Judith, 1 C. Rob. Adm. 150; The Adonis, 5 C. Rob. Adm. 256; The Mars, 6 C. Rob. Adm. 87; and indeed in many other cases where the owner of the ship has been held bound by the acts of the master, whether he was ignorant thereof or not. The ship is also, by the general maritime law, held responsible for the torts and misconduct of the master and crews thereof, whether arising from negligence or a wilful disregard of duty; as, for example, in cases of collision and other wrongs done upon the high seas or elsewhere within the admiralty and maritime jurisdiction, upon the general policy of that law, which looks to the instrument itself used as the means of the mischief, as the best and surest pledge for the compensation and indemnity to the injured party. The act of congress has therefore done nothing more on this point than to affirm and enforce the general principles of the maritime law and the law of nations."

The conclusion drawn from these authorities is that under the third section of the act of 1818, under which the libel in this case is filed, it is only necessary, in order to secure a condemnation of the vessel, for the libellants to show that the vessel has been fitted out and armed, or been attempted to be fitted out and armed, or been furnished, fitted out or armed, with the intent on the part of any person fitting out and arming her, or attempting to fit out and arm her, or procuring her to be fitted out and armed, or knowingly concerned in the furnishing, fitting out or arming of her, that she should be employed in the service of any foreign state, or of any people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any people with whom the United States are at peace; that it is not necessary for the libellants to prove the individuality or identity of such person, any further than to prove that the prohibited acts were done by some person; that it is not at all necessary for the libellants, to show that the owner of the vessel or his authorized agent was concerned in the commission of the prohibited acts; but the law imposes upon the owner the necessity of withholding his property from being made by any person the instrument of violating the law; and that, if the law has been violated, the vessel may be forfeited if the prohibited acts have been committed by any person, whether the owner was concerned in the violation of the law or not. The evidence given on the trial was voluminous, but was

wholly confined to the testimony put in on the part of the libellants, no evidence having been given on the part of the claimant or his principals.

After the testimony had all been put in and the summing up had been concluded, the libellants, on due previous notice, moved the court to amend the amended libel filed January 24, 1866, by inserting at the end of the fifth count the following additional counts, namely: "Sixth. That the said steamship or vessel Meteor has, on the 23d day of January, 1866, within the limits of the United States, to wit, at the Southern district of New York aforesaid, been furnished, fitted out, or armed by certain persons to the said attorney unknown with intent that such ship or vessel shall be employed in the service of a foreign state, to wit, the service of the republic of Chile, to cruise or commit hostilities against the subjects, citizens, or property of the government of her majesty the queen of Spain, with whom the United States then were and now are at peace. Seventh. That certain persons, to the said attorney unknown were, on or before the 22d day of January, 1866, within the limits of the United States, to wit, at the Southern district of New York aforesaid, knowingly concerned in the furnishing, fitting out, or arming of the steamship or vessel Meteor, with intent that such ship or vessel shall be employed in the service of a foreign state, to wit, the service of the republic of Chile, to cruise or commit hostilities against the subjects, citizens or property of the aforesaid government of Spain, with whom the United States then were and now are at peace, as aforesaid"; and also by changing the numbering of the last count in the amended libel on file from "sixth" to "eighth." The counsel for the claimant objected to the granting of the motion to amend at that stage of the trial, as unprecedented. The necessity for the proposed amendments, as urged by the counsel for the libellants, was that the first count of the amended libel averred no offence within the act of 1818; that the second count was a count for fitting out and arming the vessel; and that the third, fourth, and fifth counts, which severally averred that the vessel had been fitted out, and that she had been attempted to be fitted out, and that certain persons had been knowingly concerned in furnishing her and fitting her out, all of them averred an intent that she should be employed "in the service of some persons, to the said attorney unknown," to commit hostilities against the subjects, citizens, and property of the government of Spain, and did not any of them aver, in the language of the third section of the act of 1818, an intent that the vessel should be employed in the service of some foreign prince or state, or of some colony, district, or people. The question as to allowing these proposed amendments to be made was held open for consideration.

Courts of admiralty are little trammelled by a regard for mere technicalities, substan-tial justice without unnecessary delay or expense being the object which they keep in view. Accordingly they acknowledge no limits to their right to allow amendments when conducive to this end, in every stage of a cause, and not only in the court of original jurisdiction, but in all appellate courts, and not only in matters of form, but in matters of substance. Conk. Treatise (3d Ed.) p. 562. In the case of The Edward, 1 Wheat. [14 U. S.] 261, which was an information against a vessel for the violation of one of the embargo acts, the district court having condemned the vessel, the circuit court, on appeal, allowed the libel to be amended by inserting an averment naming the particular foreign interdicted port to which the vessel was destined. The case was then taken to the supreme court, and Mr. Justice Washington, delivering the opinion of the court, says: "It is contended for the claimant, that the circuit court has only appellate jurisdiction in cases of this nature, and that to allow the introduction of a new allegation would be in fact to originate the cause in the circuit court. This question appears to be fully decided by the Cases of The Caroline and The Emily, determined in this court. These were informations in rem under the slave-trade act, and the opinion of the court was that the evidence was sufficient to show a breach of the law, but that the informations were not sufficiently certain to authorize a decree. The sentence of the circuit court was therefore reversed, and the cause remanded to that court with directions to allow the informations to be amended." In the case of The Marianna Flora, 11 Wheat. [24 U. S.] 1, which was a libel founded on an act of congress [3 Stat. 510], against a Portuguese vessel, for an alleged piratical aggression on The Alligator, a United States armed vessel, the district court ordered restitution with damages. The circuit court, on appeal, allowed the libellants to file a new count or allegation, in which the aggression was stated to be hostile, and with intent to sink and destroy The Alligator, and in violation of the law of nations, and reversed the decree for damages, the libellants consenting to the decree for restitution. On appeal to the supreme court, Mr. Justice Story, delivering the opinion of that court, says: "An objection, which is preliminary in its nature, has been taken to the admissibility of this new count to the libel filed in the circuit court, upon the ground that the original subject-matter was exclusively cognizable in the district court, and to allow this amendment would be to institute an original and not an appellate inquiry in the circuit court. But the objection itself is founded on a mistaken view of the rights and authorities of appellate courts of admiralty. It is the common usage and admitted doctrine of such courts to permit the parties, upon the appeal, to introduce new allegations and new proofs, 'non allegata allegare, et non probata probare.' The courts of the Unit-

ed States, in the exercise of appellate jurisdiction in admiralty causes, are, by law, authorized to proceed according to the course of proceedings in admiralty courts. It has been the constant habit of the circuit courts to allow amendments of this nature in cases where public justice and the substantial merits required them; and this practice has not only been incidentally sanctioned in this court, but on various occasions, in the exercise of its own final appellate jurisdiction, it has remanded causes to the circuit court, with directions to allow new counts to be filed." It is well settled in the practice of the courts of admiralty of the United States, that where, on the evidence, the merits are clearly with the libellant, but the libel is defective, it will not be dismissed, but the party will be allowed to assert his rights in a new allegation. The Adeline, 9 Cranch [13 U. S.] 244; The Palmyra, 12 Wheat. [25 U. S.] 1. A new res or subject of controversy cannot be introduced under such privilege of amendment. but the court will not permit substantial justice to fail in respect to the matter which is the subject of the action, by reason of defects or informalities in the libel. The foundation of this power of allowing amendments is the 32d section of the judiciary act of 1789 (1 Stat. 91); and by rule 24 of the rules of practice for the courts of the United States in admiralty and maritime jurisdiction, on the instance side of the court, prescribed by the supreme court at the December term, 1844, in pursuance of the act of August 23, 1842 [5 Stat. 516], it is provided as follows: "In all informations and libels, in causes of admiralty and maritime jurisdiction, amendments in matter of form may be made at any time, on motion to the court, as of course. And new counts may be filed, and amendments in matter of substance may be made, upon motion, at any time before the final decree upon such terms as the court shall impose." The same power of amending informations in any stage of the cause is given by rule 186 of this court.

In the present case, the court is of opinion that the proposed amendments will not introduce any new res or subject of litigation, and that public justice and the substantial merits of the controversy require their allowance, and without the imposition by the court of any terms on the libellants. The amendments are, accordingly, allowed to be made, with like effect as if they had been contained in the amended libel when it was filed, and the libellants are at liberty to enter an order of amendment to that effect. If any prejudice to the claimant could arise from the allowance of these amendments, or if it were alleged that he could thereunder aver or prove matters of defence which he could not or did not adduce on the trial, the court would take care to guard him from any such prejudice. But no such objection arises, especially in view of the fact that the claimant put in no testimony in defence on the trial.

On the merits, the sole question for determination in this case is whether the averments of the libel, as thus amended, are supported by the testimony, and whether any offence prohibited by the third section of the act of April 20, 1818, was committed prior to the filing of the libel, so as to require the forfeiture of the vessel, her tackle, &c. The offences set out in the section must have been committed within the limits of the United States, and are properly classified thus: First. The fitting out and arming by any person of any vessel, with the intent on the part of such person, that she shall be employed in the service of any foreign state, or of any people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any people, with whom the United States are at peace. Second. The attempting by any person to fit out and arm any vessel with the like intent. Third. The procuring by any person to be fitted out and armed, any vessel with the like intent. Fourth. The being knowingly concerned by any person in the furnishing of any vessel with the like intent. Fifth. The being knowingly concerned by any person in the fitting out of any vessel with the like intent. Sixth. The being knowingly concerned by any person in the arming of any vessel with the like intent. Seventh. The issuing or delivering by any person of a commission, within the territory or jurisdiction of the United States, for any ship or vessel, to the intent that she may be employed as aforesaid. If any one of these offences has been committed, the vessel in respect to which it is committed is, with her tackle, &c., to be forfeited.

It was strenuously urged by the counsel for the claimant, on the hearing, that the only crime created by the third section of the act of 1818 is the crime of fitting out and arming a vessel with the intent named in the statute; and that, although the attempt to commit that crime, or the procuring that crime to be committed, or the being knowingly concerned in committing that crime is punishable under the statute, yet the body of the crime is the fitting out and arming, and nothing short of that is punishable under the statute, either against the wrong-doer personally, or against the offending res; and the interpretation sought to be put by the counsel upon these words of the statute, "or shall knowingly be concerned in the furnishing, fitting out, or arming of any ship or vessel, with intent," &c., is, that it is not necessary to the criminality of the individual that he should have performed every part of the crime, but it is enough if he was knowingly concerned in any one step in the chain of conduct which completed the criminality, or would have completed it if carried out, but still the crime must be the crime of fitting out and arming, either completed or attempted. But the court cannot adopt this interpretation of the statute. The mischief against which the statute

intended to guard was not merely preventing the departure from the United States of an armed vessel, but the departure of any vessel intended to be employed in the service of any foreign power, to cruise or commit hostilities against any foreign power with whom the United States are at peace. The neutrality of the government of the United States, in a war between two foreign powers, would be violated quite as much by allowing the departure from its ports of an unarmed vessel with the clear intent to cruise or commit hostilities against one of the belligerents, as it would be by permitting the departure from its ports of an armed vessel with such intent. If the intent to cruise or commit hostilities exists when the vessel departs, and the vessel is one adapted to the purpose, the subsequent arming is a very easy matter. The facility with which this can be done was made manifest in the case of The Shenandoah and other vessels which, during the late Rebellion, left England unarmed, but with the full intent on the part of those who sent them forth that they should be used to cruise and commit hostilities against the United States, and were subsequently armed in neutral waters. It would be a very forced interpretation of the statute to say that it was not an offence against it to knowingly fit out a vessel with everything necessary to make her an effective cruiser, except her arms, and with the intent that she should become such a cruiser, because it could not be shown that there was any intent that she should be armed within the United States. The evil consequences which would flow from interpreting the statute to mean that the crime must include the arming of the vessel within the United States, become especially apparent in reference to that part of the third section which forbids the issuing or delivering a commission, within the territory or jurisdiction of the United States, for any ship or vessel, to the intent that she may be employed for the purpose named in the section. Under such an interpretation of the statute, it would be no offence to issue or deliver a commission within the United States for any vessel, unless such vessel were actually armed at the time, or perhaps were intended to be armed prior to her departure from the United States; and it would be no offence to issue a commission within the United States for a vessel fitted and equipped to cruise or commit hostilities, and intended to cruise and commit hostilities, so long as such vessel was not armed at the time, and was not intended to be armed within the United States, although it could be shown that a clear intent existed, on the part of the person issuing or delivering the commission, that the vessel should receive her armament the moment she should be beyond the jurisdiction of the United States. The court cannot give any such construction to the statute. Such a construction was repudiated by the supreme court in the case of U. S. v. Quincy, 6 Pet. [31 U. S.] 445. That

was an indictment founded on the same section of the act of 1818 on which the libel in the present case is based. It came before the supreme court on a certificate of a division of opinion from the judges of the circuit court for the district of Maryland. The division of opinion arose on two counts of the indictment, and on the evidence given in reference to the matters in those counts. Those counts were alike in substance, and averred that the defendant, within the limits of the United States, was knowingly concerned in the fitting out of a vessel called the Bolivar, with intent that such vessel should be employed in the service of the United Provinces of Rio de la Plata, to commit hostilities against the subjects of the emperor of Brazil, with whom the United States were at peace. There was no averment in either of the counts that the vessel was armed or was intended to be armed. On the trial before the circuit court evidence was given of the repairing and fitting out of the vessel, under the superintendence of the defendant, at Baltimore. It was contended before the supreme court by Mr. Wirt, on the part of the defendant, that the only mischief which the act of 1818 was intended to remedy was the arming and equipping of vessels in our ports, and the sending them forth, in warlike array, to cruise and commit hostilities on foreign nations with which we were at peace, and that the act was not intended to reach a vessel whose equipments were so equivocal as to be applicable either to commerce or war; that the statute, being a penal statute, should be interpreted strictly; that the third section of the statute required that the vessel should be completely fitted out and armed in our own ports, and be there put in a condition to commit hostilities immediately; that in order to convict any person of an attempt under the section, it must be shown that his object was to fit out and arm completely, and to place the vessel in all respects in a state for immediate hostilities; that, in order to be guilty of a procurement under the section, the charge must not be that the accused procured the vessel to be fitted out, merely, but that he procured her to be fitted out and armed; that with respect to that part of the section which speaks of persons knowingly concerned in the furnishing, fitting out or arming of a vessel, the participation of those persons is of an accessorial character; that there is under the statute a principal in the offence and an accessory; that the offence must have been committed, that is, there must have been a fitting out and arming, or an attempt to fit out and arm, or the principal actor has been guilty of no offence; that it could not have been intended to punish the secondary or accessorial actor, if the principal actor has not been guilty of an offence; that this consequence would follow, if any one had knowingly furnished articles to the vessel to be used for that purpose, and yet if, before the complete fitting out and arming had been accom-

plished, the vessel had been seized and this consummation prevented, the prime actor thus not being indictable under the law; that thus a part of a transaction would become a crime in one citizen while the whole of it would not be a crime in another; and that if the fitting out per se is, under the third section, a crime, without arming, the copulative "and" would have found no place in the section, and the language of the law would have been "fit out or arm" and "attempt to fit out or arm." The supreme court unanimously overruled these views. Mr. Justice Thompson, delivering its opinion, after stating the prayers upon which the opinions of the judges of the court below were opposed, says: "The instruction which ought to be given to the jury under these prayers involves the construction of the act of congress touching the extent to which the preparation of the vessel for cruising or committing hostilities must be carried before she leaves the limits of the United States, in order to bring the case within the act. On the part of the defendant, it is contended that the vessel must be fitted out and armed, if not complete, so far at least as to be prepared for war, or in a condition to commit hostilities. We do not think this is the true construction of the act. It has been argued that although the offence created by the act is a misdemeanor, and there cannot, legally speaking, be principal and accessory, yet the act evidently contemplates two distinct classes of offenders,—the principal actors, who are directly engaged in preparing the vessel, and another class, who, though not the chief actors, are in some way concerned in the preparation. The act in this respect may not be drawn with very great perspicuity. But should the view taken of it by the defendant's counsel be deemed correct (which, however, we do not admit), it is not perceived how it can affect the present case. For the indictment, according to this instruction, places the defendant in the secondary class of offenders. He is only charged with being knowingly concerned in the fitting out the vessel, with intent that she should be employed, &c. To bring him within the words of the act, it is not necessary to charge him with being concerned in fitting out and arming. The words of the act are, 'fitting out or arming.' Either will constitute the offence. But it is said such fitting out must be of a vessel armed, and in a condition to commit hostilities, otherwise the minor actor may be guilty when the actor would not, for as to the latter there must be a fitting out and arming, in order to bring him within the law. If this construction of the act be well founded, the indictment ought to charge that the defendant was concerned in fitting out the Bolivar, being a vessel fitted out and armed, &c. But this, we apprehend, is not required. It would be going beyond the plain meaning of the words used in defining the offence. It is sufficient if the indictment charges the offence in the words of the act;

and it cannot be necessary to prove what is not charged. It is true, that with respect to those who have been denominated at the bar the chief actors, the law would seem to make it necessary that they should be charged with fitting out 'and' arming. These words may require that both should concur, and the vessel be put in a condition to commit hostilities, in order to bring her within the law. But an 'attempt' to fit out 'and' arm is made an offence. This is certainly doing something short of a complete fitting out and arming. To attempt to do an act does not, either in law or in common parlance, imply a completion of the act, or any definite progress towards it. Any effort or endeavor to effect it will satisfy the terms of the law. This varied phraseology in the law was probably employed with a view to embrace all persons of every description who might be engaged, directly or indirectly, in preparing vessels with intent that they should be employed in committing hostilities against any powers with whom the United States were at peace. Different degrees of criminality will necessarily attach to persons thus engaged. Hence the great latitude given to the courts in fixing the punishment, viz. a fine not more than ten thousand dollars, and imprisonment not more than three years. We are accordingly of opinion that it was not necessary that the jury should believe or find that the Bolivar, when she left Baltimore, and when she arrived at St. Thomas, and during the voyage from Baltimore to St. Thomas, was armed, or in a condition to commit hostilities, in order to find the defendant guilty of the offence charged in the indictment."

In view of this decision, it must be regarded as the settled interpretation of the third section of the act of 1818, that that section applies to every person who is engaged within the United States, directly or indirectly, in preparing a vessel with the intent that she shall be employed in committing hostilities against any power with which the United States are at peace, and to every such vessel, whether such vessel be armed in the United States or not, or be intended to be armed in the United States or not.

Having determined the true interpretation of the section of the statute on which the libel in the present case is founded, the next inquiry is, as to whether any of the offences prohibited by that section have been committed; and, as it is not claimed that the Meteor was armed in the United States, or was intended to be armed within the United States, the inquiry may be limited to the question as to whether any person was knowingly concerned in furnishing or fitting out the Meteor with intent that she should be employed in the service of the government of Chile, to cruise or commit hostilities against the subjects or property of the queen of Spain, the United States being at the time at peace with the queen of Spain.

The libellants put in evidence a certificate

made by the secretary of state of the United States under his hand and the seal of the department of state, dated the 29th of March, 1866, certifying "that it appears, from authentic official information on file in this department, that a state of war has existed between Spain and the republic of Chile, from the 25th of September, 1865, up to the present time; that the United States are, and have been during the same period, at peace with both the aforesaid nations; and that Stephen Rogers was recognized as consul, ad interim, of the republic of Chile, for the port of New York and its dependencies, from the 13 of October, 1864, to February 12, 1866, when his exequatur was revoked." The libellants also put in evidence a certificate made by the secretary of state of the United States, under his hand and the seal of the department of state, dated March 31, 1866, embodying the translation of a document officially communicated to, and then on file in that department, being the promulgation by the government of Chile, at Santiago, on the 25th of September, 1865, of the declaration of war between the republic of Chile and the government of Spain. The counsel for the claimant objected to the admissibility in evidence of these certificates, upon the ground that they were not made evidence by any statute, and were not competent evidence of the existence of the facts stated in them. The court overruled the objection. There can be no doubt as to the competency of the testimony. By section 5 of the act of September 15, 1789 (1 Stat. 69), it is provided that all copies of records and papers in the office of the secretary of state, authenticated under the seal of office of the department, shall be evidence equally as the original record or paper. It is laid down in 1 Greenl. Ev. § 479, that the certificate of the secretary of state of the United States is evidence that a particular person has been recognized as a foreign minister. In Bingham v. Cabot, 3 Dall. [3 U. S.] 19, it was held that a certified copy, under the hand and seal of the secretary of state of the United States, of the letters of the agent of congress resident abroad, addressed to that body, relative to the business of his trust, and of the official order of a foreign colonial governor concerning the sale and disposal of a cargo of merchandise, were admissible evidence of those transactions. In U. S. v. Liddle [Case No. 15,598], which was an indictment for an assault and battery on a member of the Spanish legation, it was held that the certificate of the secretary of state was good evidence, and the best, to prove that the person on whom the assault and battery was committed had been received by our government as a secretary attached to the Spanish legation; on the ground that the secretary of state was the proper organ of the government, his certificate, being an acknowledgment by the government that the person had been received in the character attributed to him, was the best evidence of the fact. In

U. S. v. Benner [Case No. 14,568], which was an indictment for arresting and imprisoning the secretary of legation of the minister from Denmark, it was held that a certificate from the secretary of state, under the seal of the department, that the person had been recognized by the department as attached to the legation of Denmark, was full evidence that he had been authorized and received by the president in the character referred to. The same principle was held in the case of U. S. v. Ortega [Id. 15,971], which was an indictment for an assault upon a Spanish chargé d'affaires. It is well settled that public documents, properly authenticated, and whose contents are pertinent to the issue, when authenticated by the public officer whose duty it is to authenticate them, and when their contents are such as belong to the province of the officer or come within his official cognizance and observation, are admissible to prove at least prima facie the facts they recite. 1 Greenl. Ev. § 491. In Thelluson v. Cosling, 4 Esp. 266, it was held that a paper being a declaration of war made by Spain against France, transmitted to the office of the secretary of state in England by the ambassador of England at Madrid, and produced in court from that office, was sufficient evidence of the date of the declaration of war. These principles cover all the facts embraced in the certificates from the department of state, and those certificates are sufficient prima facie evidence of the facts covered by them. It is, therefore, established,—First, that a state of war existed between Spain and Chile from the 25th of September, 1865, to the time of the trial; second, that the United States during that period were at peace with both Spain and Chile; third, that Stephen Rogers was the recognized consul of Chile at New York from the 13th of October, 1864, to the 12th of February, 1866.

The court is not left to speculate as to the character and capacity of the Meteor, as a vessel capable of being used to cruise or commit hostilities in a warlike character. In many, if not most cases of prosecutions under neutrality acts, it appears that artifices and subterfuges have been resorted to, which leave it very much in doubt, on the evidence, whether the vessel were not fitted and intended equally well for innocent commercial purposes and for purposes of war; just as, in cases of prosecutions under the slave-trade acts, it often appears difficult to determine whether the vessel fitted out was intended for a whaler or for a slaver. This embarrassment in determining whether a warlike character could be affixed to the vessel beyond doubt was manifested in a very marked degree in the case of the prosecution against the Alexandra, in England, under the British neutrality law. But, in the present case, the Meteor is characterized by Mr. Robert B. Forbes, one of her owners, in a letter written by him from Boston, on the 13th of September, 1865, to a gentleman in New York, in the

following terms: "The Meteor is for sale, but I have not offered her, because she needs cleaning up and painting, after her late experiences carrying troops and cargoes. She can be bought for much less than cost, and much less than she can be built for today. I can not name a price until I consult the other owners. I am open to an offer. Am I to understand that you are acting as a broker, and, if so, whether you expect to earn a commission out of us, and how much, if you should buy her? She was destined to carry one heavy pivot amidships, on gun deck, or two 10-inch or other guns at the same point, namely, just before the mainmast; forward of this are four ports (two on each side), where 8 or 9 inch Dahlgrens would have been mounted, had she been taken by the United States navy department; and abreast of the engine-hatch, aft, there are two ports on each side, where she could have mounted short 32's, or 24 pound howitzers; and on upper deck there are beds for two 30 pound Parrots: making one pivot 11 inch, or two 10 inch; four broadside, 8 or 9 inch; four 32 or 24 pound howitzers on gundeck; two light chase guns on upper deck. She has two 62½ by 36 inch cylinders, four tubular boilers; propeller of brass, 13½ feet diameter and 23 feet pitch. The motive-power, boilers, &c., were imported from Scotland, at a very large cost, and are first quality. The ship was built by myself and a few friends, to cruise after British pirates, and she would have been taken by the U. S. had not Fort Fisher fallen just as it did. She was first under steam at sea last December, and was tried under the auspices of the Navy Dept. at the measured mile, below New York, on the 5th January, when, according to the report, she attained a rate of speed said to be superior to that of any propeller tried over that ground by the United States. Since April 1, she has been three trips South with troops, and one to New Orleans with cargo. H. B. Cromwell & Co. loaded her out, and wrote that she was the most capable ship they had loaded, being full of heavy cargo on 16 feet 4 by 14 feet draught." This letter proves that the Meteor was a vessel of war, constructed to cruise and commit hostilities, and intended to be mounted with eleven or twelve guns, and of great speed and carrying capacity; that there were other owners of her besides Mr. Forbes; and that she was for sale, and at a price much less than her cost, and much less than a similar vessel could be built for. The fact that there were other owners of the Meteor besides the Messrs. Forbes is shown by the testimony of Mr. Robert B. Forbes, and he gives the names of such owners. Three of them, Messrs. Abiel A. Low, William H. Aspinwall, and Leonard W. Jerome, were examined as witnesses for the libellants on the trial, and it appears that all of these witnesses advised and desired the sale of the vessel. It also appears that a person by the name of Benjamin V. Mackenna left Chile to come to this country on the 1st of October, 1865, and arrived here on the 19th of November, 1865; that he occupied the position in Chile of a member of the house of deputies, and secretary thereof; that he was appointed before he so left Chile, confidential agent in the United States of the government of Chile; and that he held that position from the time of his so leaving Chile down to the time of the trial.

The only testimony adduced upon the trial as to any direct conference between any one of the owners of the Meteor and any person holding an official relation to the Chilian government, in respect to the Meteor, is that given by Mr. Jerome. He was called by the libellants as a witness, and was examined on the 7th of April, and testified, on his direct examination, that he had once, and but once, been on board the Meteor; that that was some four or five months ago; that Mr. Asta Buruaga, the Chilian minister, was in his company at the time; that the vessel was lying at the time at Jersey City; and that he met the Chilian minister at the vessel by agreement. The witness was then asked: "Q. What was the agreement you made with him by which you met him there? A. I asked him to look at the ship. Q. For what purpose? A. To see if he would buy her. Q. And he did look at the ship? A. He did. Q. Did you and he examine the ship together on that occasion? A. We went through her partially, not much." Again, he says in reference to conversations with Asta Buruaga: "I never had any conversations with Asta Buruaga after the Chilian war began; my conversation with him was some time previous to the war. Q. What time did you visit the Meteor as she lay at Jersey City? A. It was some time previous to the arrival of the news of the declaration of war between Spain and Chile. Q. What month was it that you and Buruaga visited the Meteor together? A. I cannot tell. Q. Was it the month of November last? A. I cannot tell you; my memory is very poor about dates. Q. Was it in the month of October? A. I don't know. Q. Was it in the month of September? A. I don't know the month. Q. What year was it? A. I should think it was in the year 1865. Q. Have you any doubt about its being in the year 1865? A. Very little. Q. How long was it before the seizure of the vessel? A. Well, I cannot tell, several months. Q. When you use the expression 'several months,' how many months do you mean? A. Well, I cannot say how many, I should say over two. Q. Is that as near and as definite as you can be as to the time? A. On reflection, I should say it was three instead of over two. Q. Is that as near and as definite as you can be as regards the time? A. Yes; I cannot tell you any exact dates about it. Q. When was the vessel seized? A. That I do not know. Q. She was seized on the 23d of January, 1865. How long before that was it you were with Asta Buruaga on board the vessel? A. I do

recollect dates. If you wish to fix the time, I can give it positively; it was some time before the arrival of the news of the declaration of war. Q. When was the news of the declaration of war? A. That I do not know. Q. When did you first hear of it? A. I heard of it the next morning after it arrived here by the Aspinwall steamer. Q. How long ago was it? A. I do not know; I cannot give the date. Q. About how long ago was it? A. Sometime in the year 1865. Q. Is that as near and as definite as you can be,—that it was sometime in the year 1865? A. You asked me when the news of the declaration of the war came; I am positive it was in that year. Q. Is that as near and as definite as you can be,—that it was sometime in the year 1865? A. No, I can bring it down, I think, subsequent to the 1st of July; I would not be perfectly positive of that, but I think so." On his cross-examination, the witness testified: "Q. You said that you met the minister on board the Meteor by previous appointment. Was that appointment made the day before or the week before? A. I cannot recollect that. Q. Was it made soon before you met on board? A. It was very soon before; I cannot tell but that we went right over the same morning; I merely asked him to look at the ship. Q. How long had the ship been for sale? A. She had been for sale ever since the close of the war. Q. Since about a year ago? A. Yes, sir. Q. Was there anything else between you except that he was to look at the ship as a matter for sale? A. That is all. Q. To see whether he would buy it? A. I don't think he had much intention of buying it, anyway; he went over there; I wanted to see the ship myself; I had never been on board of her. Q. Was there anything but the sale talked of, or suggested, on either side? A. No, sir. Q. The sale of the ship as she lay? A. Yes, sir." On his redirect examination, he testified: "Q. What time did you and Asta Buruaga make this appointment to see the ship? A. I don't know. Q. Have you any recollection on the subject that is at all definite? A. I have not; it was not an event that fixed itself very particularly in my mind. Q. I understood you, on your direct examination, that he wanted to buy the ship? (Mr. Evarts objects that the witness did not use that language.) Q. Did I understand you as stating, on your direct examination, that the Chilian minister desired to purchase the ship? A. No, sir. Q. What did you say in regard to that matter? A. I said I asked him to go and look at her.—(The stenographer was called upon to read the witness his testimony.) Q. Do you desire to change your testimony, in that respect, or is it correct? A. Not exactly; I am recorded there as saying that I asked him there to see if he would buy her. Q. In what particular is your testimony incorrect? A. I could not expect him to buy her, because he had no power to buy her, as I understood; the ship was for sale,

and I wanted him to look at her; perhaps he might recommend her. Q. You say you did not expect him to buy her? A. No, sir. Q. Because he had not the authority to buy her? A. No. Q. Who did you suppose had the authority to buy her? A. I did not suppose any one had at that time; I thought the occasion might turn up. Q. How did you know he had not authority to buy her? A. I did not know. Q. What did you mean when you said you did not suppose he had authority to buy her? A. I simply did not suppose he had. Q. Who did you suppose had? A. I did not suppose anyone had. Q. Why, then, did you ask the Chilian minister to look at the ship? A. Well, I thought the occasion might turn up that he might want to buy her."

It is quite apparent, from the whole of this testimony, taken together, that Mr. Jerome, as one of the owners of the vessel, put himself into communication with the representative of the Chilian government, with a view to the sale of the vessel to that government; and whether this visit of Mr. Jerome, in company with the Chilian minister, to the Meteor, took place after intelligence of the declaration of war between Chile and Spain was received in the United States, or at a period so shortly before that time that affairs between Chile and Spain were in such a condition as to give rise in Mr. Jerome's mind to the impression that the occasion was likely to "turn up" when the Chilian minister might want to buy the vessel, is immaterial to the point under consideration. That point is the direct communication between one of the owners of the Meteor and the representative of the Chilian government, at a date not far distant from the time when the war broke out between Chile and Spain, in reference to the sale of the vessel to that government. And the evidence of Mr. Jerome establishes this point.

It also appears that the claimant, Cary, was in treaty with the Chilian government for the sale of the Meteor to them, after the war between Chile and Spain had broken out. Cary was the authorized agent of the owners. A letter is in evidence written by the Messrs. Forbes to Charles L. Wright & Co., ship-brokers, dated Boston, December 13, 1865, stating that an engagement of Messrs. Cary & Co., in regard to the sale of the vessel, would be duly ratified by the Messrs. Forbes. Charles L. Wright testifies, that within a day or two after the receipt of that letter of the 13th of December from the Messrs. Forbes, he had a conversation with Cary, at his, Wright's, office, in regard to the sale of the Meteor; that Cary asked for the names of the witness's principals; that the witness told him he believed that the parties represented the Chilian government; that the parties he referred to were then in fact in an adjoining room; that he, Wright, then went into that room, and had an interview with those parties (McNichols, Byron and

Conkling), in which they said that they represented the Chilian government; that after that he saw Cary again, and told him that he, the witness, believed the parties wished to purchase the boat for the Chilian government, and Cary replied: "If these are your parties, I don't think you can do anything with them, because I don't believe they have any money;" and that Cary also said that he, Cary, had had an application of that kind before, and they had no money. Again, this witness, being asked if anything was said by Cary, at the interview with him, to the effect or in substance that he had already had negotiations for the sale of the Meteor to the Chilian government, answers: "As I have said, at that time he said he had already been in treaty with them, and they had no money." Wright states in his testimony how he came to have this interview with Cary. It was as follows: About the 1st of December, 1865, three men, named Byron, McNichols, and Conkling, called at Wright's office in New York. These were the same persons before referred to as being in an adjoining room, at the time of the interview between Wright and Cary, after the receipt by Wright of the letter from Forbes. These men opened negotiations with Wright for the purchase of the Meteor for the Chilian government. Wright saw the three men almost every day during the month of December. About the middle of December, and in consequence of the negotiations he was having with the three men, Wright went to see Rogers, the Chilian consul, at Rogers's house in New York, and Rogers then gave Wright to understand that the three men who were so negotiating for the purchase of the Meteor were in communication with him, Rogers, in regard to the matter. The negotiations that were thus carried on between Byron, McNichols, and Conkling on the one part, and Wright on the other, satisfactorily appear to have been carried on, on behalf of the Chilian government on the one side and the owners of the Meteor, represented by Cary, on the other. We therefore find the authorized agent of the owners of the Meteor knowingly concerned in negotiating for the sale of the vessel to the Chilian government in December, 1865, after the announcement of the war between Spain and Chile. Wright further testifies, that in reply to Cary's remark that the parties had no money, he, Wright, stated to Cary that he believed they could make arrangements for some money, and that if so, he, Wright, would communicate with him, Cary, further; and that Cary called again at his, Wright's office about the 20th of December, to inquire if there had been anything done. McNichols testifies that Rogers, the consul, told him, in November or December, 1865, that the special agent or the Chilian minister (the witness forgot which) had been negotiating about the Meteor, and the delay was for want of funds, and that the Meteor had been offered to the functionary for a little less than two hundred thousand dollars in gold.

The testimony, therefore, is abundant that the owners of the Meteor, both directly and through their recognized agent, Cary, were knowingly carrying on negotiations with persons whom they recognized as authorized to represent the Chilian government, and who did in fact represent that government, for the sale of the Meteor to that government; that the negotiations between Cary and Wright were carried on during the war between Spain and Chile; and that Wright disclosed to Cary that his principals were the Chilian government.

The Meteor was seized on the 23d of January, 1866. The manifest of her cargo furnished to the custom-house by her master, and put in evidence, sets forth her cargo as being fuel and stores, and her destination as being Panama, with a crew fifty-seven in number.

The government inspector, Louis J. Kirk, testifies, that the day before she was seized, she being put up for clearance, and some question being raised in regard to her, he went on board of her and examined her at her dock at Brooklyn, at the request of the surveyor of the port; that he saw large quantities of ordinary ship's stores on board and a large quantity of coal; that he examined her cargo-book; that he saw no freight or merchandise on board; that the mate told him they had no freight; and that the mate said he was going to Panama and had signed papers for a year, and calculated to be in New York in three months from the time he left. James K. Ford testifies, that two Parrot guns, and eleven cases supposed to contain shell or shot, six gun tackles, and some other appurtenances for cannon, were placed by a Mr. Smith, acting for the firm of Cary & Co., in his, the witness's, public store in Brooklyn, on the 18th day of January, 1866. Wright testifies, that about the middle of December he told Rogers, at Rogers's house, that he did not think it possible to get an armed vessel, like the Meteor, away from New York.

William Jarvis, a deputy marshal, testifies, that under orders from the marshal he arrested the Meteor on the 23d of January between 12 and 1 o'clock; that at the time she had steam up and the crew on board, and was getting ready to go to sea; that Mr. Robert B. Forbes was on board; that Mr. Forbes stated to the mate in the witness's presence, that he was sorry he had missed his trip down to the Narrows in the boat; and that Mr. Forbes called for his carpet-bag and took it ashore with him.

Thomas H. Sease testifies, that after the seizure of the Meteor by the marshal, he acted as one of the ship-keepers on board of her and lived on board of her; that on the 2d of February the captain of the Meteor asked of the witness permission to take on shore five and a half boxes of shot for Parrot guns, and stated that the guns belonging to the ship had been stored in the Pierrepont stores; that the

witness saw the boxes of shot and the shot in one of the boxes which had been opened; that the captain said to him, in reference to the boxes, that he had ordered all the things to be taken on shore, and these had been in some way overlooked and left on board; that the witness told him that he could not take them on shore without the marshal's permission; that the captain then said, "Never mind, don't say anything about it."

Frederick Nichols, a mariner, testifies, that on the Friday before the Meteor was seized he was on board of her and saw barrels of stores going on board, and was told by the stevedore, who was engaged in loading them, that the vessel was bound to Chile; that he saw on board a large quantity of coal in bags and in bins, and a case of rifles, and a small box of cartridges for Sharpe's rifles; that the hold of the vessel appeared to be nearly full; that on that day he saw Mr. R. B. Forbes on board, and heard him, in answer to a question from the mate of the vessel, reply, "Put them in the racks, certainly;" that Forbes and the witness left the vessel together; that on the way up the wharf Forbes remarked to the witness that the vessel was very buoyant for a vessel that 750 tons of coal on board and six months' stores; that the witness told Forbes he thought she was bound for Chile, and Forbes said she was cleared for Panama, or she will clear, and the witness added: "I will not say whether he said she was cleared, or bound, for Panama"; and that the witness and Forbes crossed the ferry together. The witness gives this account of a conversation with Forbes on the ferry-boat: "Q. Did you have any conversation with him crossing the ferry? A. We talked in the same strain over in the boat. Q. What did you say? A. I told him I supposed if that vessel had gone to Chile, I would have gone in command of her, or something like that. That was the only remark I made. Q. State in what tone of voice you talked with Mr. Forbes,—whether loud or otherwise. A. I talked pretty loud, because Captain Forbes is a little troubled with deafness or does not hear accurately. Q. When you told him that, what did he say? A. He told me that I had not ought to talk quite so loud in public about such matters; I would not say that these were his words, but that this was the meaning, and I think the words were used." The witness also says, that on the same day or the next he, in company with Wright, went to see Rogers at his house, and the witness and Wright remarked that they thought the Meteor was off for Chile; that Rogers remarked, during the conversation, that Mackenna had done this business through some other brokers, and they thought they had got a good bargain in the Meteor, because they had got 750 tons of coal in the contract; that Rogers, in reply to a remark from the witness or Wright about the stores being marked for Panama, said that the vessel was to go to Panama and there was to be turned over and change command. The witness then says:

"Q. Did he say to whom she was to be turned over? A. Our conversation was of Chile, but I cannot swear that he used the word Chile on that occasion. Q. Was anything said as to the officer to whom she was to be turned over at Panama? A. I think he said Williams. Q. (by the Court) Who was Williams? A. One Williams was a man in command of the Esmeralda. Q. Nothing was said about what Williams it was? A. No, sir. Q. What did you say about Williams being an officer of the Chilian navy? A. The one I had reference to was in command of the Esmeralda when she captured the Carvadonga. Q. Did he call him anything else but Williams? A. I do not remember that he did; he might." This witness also says that on the Monday before the seizure of the vessel, he saw Mackenna, and that this conversation took place between them: "I told him I supposed that the Meteor was off; he shrugged his shoulders and said he did not know she was; I told him I had supposed that I would go out in command of her if she went out, but I saw that no officer that had served in the Union army had any chance with him, but that all the officers I heard of his appointing were the meanest rebels he could get hold of, and I thought he would make a very good rebel himself. He said: 'Wait, wait! there may be an opportunity yet to ship.' That was all that occurred." This witness also says, that the master of the Meteor, Captain Kemble, told him, before the seizure, that if the parties Byron, McNichols, and Conkling bought her, he, Kemble, would go out and deliver her over to some other parties or some other officers.

We are now brought to an examination of the testimony given by the witnesses Wright, Hunter, McNichols, Conkling, Nichols, and Ramsay, upon the subject of the negotiations between the parties who acted for the Chilian government on the one side and the agent of the owners of the Meteor on the other, in reference to the sale of that vessel. The parties employed by Rogers, the Chilian consul, to enter into negotiations for the purchase of the Meteor, were McNichols, Conkling, and Byron. Byron has not been examined as a witness. McNichols and Conkling testified as witnesses for the libellants, and it will be proper first to examine their testimony.

McNichols says, that he knows Wright and Rogers, but not Mackenna: that he first saw Rogers about the latter part of October, or the beginning of November, 1865, and he identified Rogers in the court-room; that Conkling went with him on that occasion to see Rogers, at Rogers's house in New York; that Rogers told McNichols and Conkling, at that interview, that he wanted vessels for war purposes for the Chilian government, wooden screw propellers, and heavy guns, for the Chilian navy, and wished to know whether McNichols and Conkling had any facility in finding such a class of vessels; that he, McNichols, told Rogers that that was in their line, and they could furnish him with

estimates; that the witness and Conkling saw Rogers again at his house three or four days afterwards; that the witness furnished Rogers on that occasion with a description in writing of different steamers, not including the Meteor, however; that on that occasion the witness had some conversation with Rogers in reference to the style of clearing vessels at New York, and in reference to arms, and left with Rogers estimates of arms for the navy; that Rogers said he would leave them with the special agent or the Chilian minister and report again; that the witness saw Rogers, at different times before taking to him the list of the Meteor; that about three weeks after the last-named conversation the witness and Conkling went to Rogers's house with the estimate of the Meteor; that on that occasion Rogers said that he did not think the brokers had control of the sale of the Meteor, and that he understood there were arrangements made concerning her, and that she was out of the market, as it were, and that the special agent or the Chilian minister (the witness forgot which) had been negotiating about the Meteor, and the delay was for want of funds; that Rogers also stated, at that time, that the Meteor could be had on more advantageous terms if there was a good capitalist who could advance the funds to buy her from Mr. Forbes, and that the Meteor was offered to the special agent or the Chilian minister (the witness forgot which) for a little less than two hundred thousand dollars in gold, and that the estimate of Mr. Wright was much larger than that; that Rogers also then told the witness to ascertain if Wright & Co. actually had the control of the sale of the vessel, and to be sure if they had; that he, the witness, believed that there was some mention made at that interview, that if a capitalist would undertake to advance the money to purchase the Meteor from Forbes & Co. and clear her from New York, there could be no dispute of the agent or special agent at New York paying a very handsome price or a very liberal price; that the witness, in company with Conkling, saw Rogers on the next night after that, at Rogers's house, and told Rogers that Wright represented that he had the entire control of the sale of the Meteor; that some conversation then took place about the way they wanted the broker or capitalist to advance his funds, and that there was some talk about drafts on the Chilian government; that Rogers said that the only way that they could at that time arrange for the payment of the vessel was to arrange with any capitalists in giving drafts on the Chilian government; that they had some conversation in reference to the drafts; that Rogers said he could not tell until he could hear from the minister in Washington, and wanted to know if the brokers or any capitalists had the means of advancing the money to purchase the vessel; that Rogers said it would require a large

amount of money, and wanted to know if the brokers could control the money to purchase her; that when Rogers told the witness, on the previous occasion, to be sure to ascertain whether or not the brokers had control of the sale of the Meteor, he, the witness, went down and saw the brokers, Wright & Co., and asked Wright if he had the control of her; that Wright came in from his front office, and told the witness that Mr. Cary was in the front office, and showed the witness a telegram from Mr. Forbes to Mr. Wright, and said that he had authority to sell the vessel, and asked the witness who his principals were, and the witness told him the Chilian government; that Wright then went into the other room; that the price of the vessel had been before that named by Byron to the witness; that one or two days after this interview with Wright, the witness called again on Wright in regard to the purchase of the Meteor, as Wright wanted to know the style of the bonds or drafts for the payment of the vessel,—whether they were bonds or drafts,—and to see whether he could negotiate them with a capitalist in New York, and wanted to know very minutely about it, and said he was going to call, or had called, on Duncan, Sherman & Co. in reference to them, and proposed that he should be introduced to Rogers, so that he could be in a better position to understand the thing,—the difference in exchange; that Wright made an appointment, and the witness went up with him to Rogers, with Rogers's consent; that the conversation at that interview was about the clearing of the vessel, and about the difference of exchange, and the class of bonds they would give; that Wright mentioned that the thing was almost impracticable, because no house or capitalist would run such a risk unless the exchange could be negotiated here, and thought the Chilian government should run part of the risk themselves in advancing the money here; that at a subsequent interview between the witness and Rogers, Rogers said that he thought he could get Mackenna to run one-third the risk, and that the capitalist would only have to run two thirds of the risk in clearing the vessel out from New York; that at different interviews Rogers said that Mackenna did not wish to advance any money on the Meteor or any steamer, until she was delivered outside of Sandy Hook; that at one interview Rogers said that the capitalist that would take the thing in hand should take all the risk of clearing the vessel from New York, and it would be preferable to any port in South America, and that the captain should name Buenos Ayres, as a courier could go from Buenos Ayres across the mountains in two days and a half, so that it would be an advantage to any capitalist who would accept the drafts, in getting them cashed; that Rogers said that the vessel could be accepted at sea, or outside of Sandy Hook; that at one interview Rogers

said that Captain Jones, whom the Chilian minister had sent; was acting for Mackenna as inspector, and helping to carry out business in regard to vessels; that on the Saturday before the Meteor was seized, the witness and Conkling had an interview with Rogers at Rogers's house; that on that occasion Rogers said that the sale of the Meteor was settled, and he understood she was to clear next week for Panama, and that the purchase of the Meteor was all settled; that Rogers told the witness that the Meteor was going to clear for Panama, and said that it was an understood thing what purpose she was to go for; that at the interview on the Saturday before the Meteor was seized, Rogers said that Mackenna was making use of the information that Wright and the witness had taken up to him, Rogers, and had employed other parties to accomplish his object; that on the following Monday Rogers told the witness, at the witness's office, that the Meteor was expected to clear that morning from the custom-house; that the witness took up to Rogers for Wright, estimates as to the fitting of the vessel with stores and coal for the voyage; that estimates had been left with Rogers, in reference to coaling as part of the cost; and that at the same time an estimate was left with Rogers. of the armament that would be necessary for the Meteor.

Conkling testifies, that he became acquainted with Rogers about the 1st of November, 1865; that he, in company with McNichols, saw Rogers at Rogers's house in New York, on the Saturday evening prior to the seizure of the Meteor; and that Rogers then said to McNichols that the vessel would probably sail on the first of the week, perhaps on Monday, and that all the arrangements had been completed for her sale to the Chilian government, he believed, by Mackenna.

Wright testifies that he is a ship-broker; that about the 1st of December, 1865, a man calling himself Byron called at his office, and asked him if he had any sea-going steamers for sale; that the witness asked Byron what kind he wished, and he said he wished to purchase three or four good fast sea-going steamers; that the witness made a memorandum of it, and told Byron he would see if he could look up such ones as he wanted; that Byron called again the next day and the witness gave him a list of two or three steamers, including the Meteor, and asked him who he wished the vessels for; that he told the witness he would bring the parties to the office; that the next day he brought McNichols and Conkling to the witness's office and introduced them to the witness as his principals; that the witness then asked McNichols and Conkling if any of the vessels named in the list would suit them, and they told them that the Meteor was the vessel they wanted,—that had been selected from the list; that then they asked the witness if he could get the price of the Meteor,

and he told them that he would communicate with the owners of the Meteor; that the witness then sent a dispatch to his, the witness's, brother, who was in Boston on a visit, to see Mr. Forbes, of Boston, and get a price for the Meteor; that the witness got a reply from his brother and then wrote a letter to Mr. Forbes, of which the following is a copy: "New York, Dec. 12, 1865. R. B. Forbes, Esq., Boston. Dear Sir. We telegraphed our Mr. H. H. Wright, at your city, to obtain from you the price of the Meteor, subject to com. of five per cent. to us, and have his reply offering the ship at $350,000. In your absence, we called on Messrs. Cary & Co., who furnished us particulars, which we have handed to our parties. They have made a slight inspection of the ship and propose sending their engineers on board to-morrow, when, if they mean business, we shall be prepared to make an offer. Mr. Cary has called on us to-day, and says he is the party through whom the purchase is to be made. We telegraphed as above, supposing you were the only party. Please set us right on this point, as we do not wish any collision, should we effect a sale. Yours truly, Chas. L. Wright & Co."; that the witness received, in reply, from J. M. Forbes & Co., the following letter: "Boston, Dec. 13, 1865. Gent. Anything which Messrs. Cary & Co. engage will be duly ratified by us. Truly, J. M. Forbes & Co., Agents Steamer Meteor, Messrs. C. L. Wright & Co."; that on the receipt of that letter the witness replied to it as follows: "56 South Street, New York, Dec. 14, 1865. Messrs. J. M. Forbes & Co., Boston. Gent. We have your favor of yesterday. We will arrange all matters with Mr. Cary according to your request. Some matters of detail have prevented us from making an offer for a day or two, but we are quite confident that we shall shortly be in shape to close with you. We are, very truly, Chas. L. Wright & Co."; that the witness saw Cary on the day he, the witness, telegraphed to his brother, or on the day that he wrote the letter to R. B. Forbes,—on the 11th or 12th of December,—at the witness's office in South street; that Byron, McNichols and Conkling were in the private office when Mr. Cary came; that Mr. Cary at that time understood the witness had been communicating with Mr. Forbes about the Meteor, and told the witness that he, Cary, had as much to say about the ship as Mr. Forbes had; that the witness told Cary that he, the witness, had parties who he thought would buy the ship, and that he would communicate with him, Cary, as soon as he could do so definitely, and would treat through him, Cary, for the purchase of the vessel; and that on that occasion nothing was said by the witness to Cary as to who the principals were. The remainder of the testimony of Wright has been heretofore recited, in considering the point as to whether the Meteor

was purchased for the Chilian government, and as to whether Cary, representing her owners, was advised of the fact that the Chilian government were the parties negotiating for the vessel through Wright.

Frederick Nichols, a mariner, testifies, that he knows R. B. Forbes, Wright and Rogers; that the first time he saw Rogers was at Rogers's house in New York, between the 15th of September and the 10th of December, 1865; that he went to the house of Rogers, the Chilian consul, on that occasion, with a man named Bates, of Valparaiso, to see if two letters of marque which Bates held were genuine; that Bates showed Rogers the two letters of marque and asked him if the signature was genuine, and said he had no doubt of it; that Bates left the letters of marque with Rogers and took from Rogers a receipt of them; that Rogers said there was to be a Chilian minister or special agent appointed for Chile, who would be here soon, and that when he arrived he, Rogers, would know then what they should do; that Bates told Rogers to let the witness have one of the letters of marque if the witness wished or if he raised stock for a privateer; that Bates asked the witness to take one of the letters of marque; that on that occasion Bates handed to Rogers a printed paper containing instructions in Spanish, some parts of which Rogers at the time translated to the witness; that the witness had a number of interviews subsequently with Rogers; that at one of those interviews Rogers said that some parties representing Chile (the witness afterwards said he thought Rogers said it was the Chilian minister) had been on board the Meteor, had seen her and liked her very much, and Rogers wanted the witness's opinion of her; that Rogers asked the witness what he thought of her and what kind of a vessel she was; that the witness replied that he had never seen her, but had often heard of her, and knew what vessel she was and what she was built for, and knew Mr. Forbes; that the witness was told by Rogers that the special agent from Chile had arrived; that Rogers called him Mackenna; that some time in December the witness went on board of the Meteor, at the request of Wright, to meet McNichols, Byron, and Conkling, and met them there and was introduced to McNichols and Conkling, having been introduced to Byron previously at Wright's office, on an occasion when Wright, at the request of Byron, sent for the witness; that the witness made an estimate, at the request of Byron, of the guns the Meteor would carry and the ammunition she would require, &c., for three or six months and gave it to Conkling or McNichols; that shortly after that the witness, in company with Wright, saw Rogers, and Rogers asked what it would require to fit the vessel out with guns and ammunition and deliver her at some foreign port (the witness did not remember exactly what,—it was called Montevideo, he thought,—or out-

side of the harbor); that the witness gave Rogers an estimate of it, or assisted to make up the estimate with Wright, and thinks it amounted to about $390,000; that at one of the interviews with Rogers, Rogers said there was difficulty in raising money to buy these vessels, but that if they could get drafts cashed on the Chilian government they could pay for the boats,—for the Meteor; that Rogers gave the witness a card of introduction to Mackenna, and the witness saw Mackenna at Mackenna's house the last of December, 1865, or the first of January, 1866, and gave him the card, and told him that he, the witness, would like to have an appointment in some way in the Chilian navy, or get command of some vessel fitting out in New York, that he had just left the United States navy and was willing to go into the Chilian service for awhile; that Mackenna said that he had heard of the witness from Rogers, and would bear him in mind, and if any opportunities offered, would let him know of it; that at that interview the witness told Mackenna that he understood that Catesby Jones had been appointed inspector of vessels for the Chilian government, and Mackenna replied: "Well, he has inspected some"; and that the witness, at that interview, suggested the names of several vessels, and that Mackenna said he wanted vessels whose machinery would run at least two or two and a half years, to go on that station. The remainder of the testimony of Nichols has been before referred to, on the point as to the knowledge by Forbes that the Meteor was destined for the service of Chile.

Daniel J. Hunter testifies that he was employed by Mackenna as translator, and resided with him, commencing in December, 1865; that he knows Rogers, and also a man called Captain Wilson; that he first saw Captain Wilson nearly a year ago in Chile, and had seen him on several occasions in this country, and had seen him three weeks ago in New York, and had seen him at Mackenna's house, and had been present at interviews between Mackenna and Wilson, and had heard them discuss, in a general way, the subject of fitting out privateers in behalf of Chile against Spain; that in those interviews the witness heard the subject of the purchase or the getting of the Meteor discussed; that the witness knows Captain Kemble; that the witness had been on board of the Meteor twice, the first time nearly three months before the time he was giving his testimony; that on the first occasion three Chilians were in company with him; that the witness had seen Captain Kemble at Mackenna's house when Kemble came and called on him, the witness; that Kemble called at Mackenna's house twice, some two or three months ago, and saw Mackenna there on both occasions, and remained at Mackenna's at those times an hour or so; that the witness knows Mr. Asta Buruaga, the Chilian minister at Washington, and had

seen him in New York, at Mackenna's house, after the arrival of Mackenna in the United States, and had seen Rogers at Mackenna's house, on a great many occasions, and had heard the subject of fitting out privateers discussed between Rogers and Mackenna in a general way, and had heard the Meteor mentioned between them.

George M. Ramsay testifies, that he knows Mackenna and Rogers, and he produces a paper, which he saw Mackenna sign in two places. The paper is signed, "Benj. Vicuna Mackenna, confidential agent of the government of Chile, in the United States of America," and is a contract dated New York, December 27, 1865, between Mackenna of the one part, and Ramsay, as the inventor and owner of certain boats called "torpedo boats," and also of torpedoes, for the delivery by Ramsay, in Chile, of two torpedo boats and ten torpedoes, within ninety days from the date of the contract, and for the personal service of Ramsay in Chile, with "the necessary skilled men to assist him to efficiently operate said two torpedo boats against the enemy's vessels of war and transports, for and in behalf of the government of Chile, for a period of one (1) year from the delivery of the said torpedo boats as herein provided, but with the proviso that should the present war with Spain terminate before the expiration of that year, then his term of service also expires." The contract also provides for the payment by the government of Chile to Ramsay of "a premium for the destruction of any and all Spanish vessels of war or transports which he may accomplish," with a provision as to fixing the amount of such premiums. In the contract, Mackenna agrees to furnish Ramsay "and his associates, such commissions as they may require, to show they are legally authorized by the government of Chile to perform such service as is herein implied and expressed." This contract has appended to it a certificate signed "Stephen Rogers, Consul for the Republic of Chile in New York," &c., &c. Hunter states that he had a talk with Rogers in regard to his giving this certificate before he, the witness, received it; and that after that conversation, he received the certificate as being provided for in the contract, and attached it himself to the contract. The certificate is dated December 29, 1865, and is as follows: "I certify that one Benjamin Vicuna Mackenna, now in this city, is duly and fully authorized by his government, the republic of Chile, to execute contracts, and sign any and all agreements for the said government, that in his discretion may promote her interests, and that, in my presence, he did sign, on the 27th inst., a contract with George M. Ramsay, respecting the sale and the operating of torpedo boats."

The testimony thus reviewed leads clearly to the conclusion, that Wright, McNichols, Conkling, and Byron, within the limits of the United States, were knowingly concerned in procuring the Meteor to be put within the control of the authorized representatives of the Chilian government, with intent that she should be employed in the service of Chile, to cruise or commit hostilities against Spain. This is, in the judgment of the court, a furnishing of the Meteor to the Chilian government with such intent. The testimony is also abundant to show that the active owners of the Meteor, and their authorized agent, Cary, were themselves knowingly concerned in offering the vessel to the Chilian authorities, and placing her within their power and control, with such intent. They, therefore, in a like sense, were concerned in furnishing the vessel, with that intent, to the Chilian government. But the evidence is also clear that Captain Kemble and others concerned in putting stores and coal on board the Meteor did so with the intent that she should be employed in the service of Chile to cruise or commit hostilities against Spain, and were thus knowingly concerned, within the limits of the United States, and with such intent, in furnishing the Meteor with stores and coal, and in fitting her out with what was necessary to make her an effective vessel. This would bring what was done within the inhibition of the third section of the statute, even though the meaning of the word "furnishing" should be limited to the act of providing the vessel with supplies, fuel, and other articles necessary or proper for her use.

Much stress was laid, in the course of the argument, by the counsel for the claimant, upon the fact that the testimony of the witnesses Wright, McNichols, Byron and Conkling, as to conversations between them on the one side, and Rogers and Mackenna on the other, was hearsay and secondary in its character. The testimony of these witnesses clearly shows that a common plan was entered upon by them and Rogers and Mackenna to procure the Meteor for the service of Chile, in the war between that country and Spain. Rogers set McNichols, Byron and Conkling in motion as his agents for that purpose. The law is well settled, that where two or more persons are associated together for the same illegal purpose, any act or declaration of one of the parties in reference to the common object, and forming a part of the res gestae, may be given in evidence against the others. American Fur Co. v. United States, 2 Pet. [27 U. S.] 358. Upon this principle the court admitted at the trial the evidence in regard to which the objection was made.

In the course of the trial, considerable evidence was received by the court provisionally, under the objection of the counsel for the claimant that such evidence would be irrelevant, if standing by itself, and if unconnected with other evidence. But, in the judgment of the court, the evidence thus objected to was made competent by being satisfactorily

connected with the rest of the evidence in the case. The court, on the trial of a cause in admiralty, is not embarrassed by the apprehension which exists on the trial of a cause before a jury, as to the effect likely to be produced by evidence which may, after it has once been given, be afterwards stricken out as incompetent. In the conduct of all trials, the evidence must come in at different stages of the trial, and it is often absolutely necessary to admit evidence the strict legal competency of which cannot be shown until after it is received. In the present case, the court has applied to the evidence the rules which govern in trials in the admiralty, and has not taken into consideration any testimony which is not admissible under those rules. The court cannot, in the present case, overlook the fact that neither Mr. Cary, nor any one of the owners of the Meteor, nor any other witness, was put upon the stand on the part of the claimant, to make any explanation as to the object for which the Meteor was about to go to sea when she was seized, or as to her real destination. In view of the testimony put in by the libellants in this case, the court is clearly of opinion that the onus probandi rested on the claimant to show the real character of the transactions in regard to the Meteor and her actual destination, if such character and destination were different from those so clearly indicated in the testimony given on the part of the libellants. The exculpatory testimony, if any existed, was within the control of the claimant, Cary, and of his principals, the Messrs. Forbes. The libellants seem to have produced as witnesses nearly every person who had any active connection with the transactions in regard to the Meteor. The absence of such exculpatory testimony is not accounted for, and the legal presumption follows, that the facts testified to by the witnesses for the libellants do not admit of a satisfactory explanation. The Short Staple [Case No. 12,-813]; s. c., 9 Cranch [13 U. S.] 55; Ten Hogsheads of Rum [Case No. 13,830]; The Struggle v. U. S., 9 Cranch [13 U. S.] 71; The Robert Edwards, 6 Wheat. [19 U. S.] 187. The very recent cases of The Slavers, 2 Wall. [69 U. S.] 350, 366, 375, 383, cases of libels under the slave-trade act [1 Stat. 347; 3 Stat. 450] three of which were originally brought in this court, lay down principles which are very pertinent to the present case. In The Kate, 2 Wall. [69 U. S.] 350, the principle laid down by this court was affirmed by the supreme court,—that when the evidence on the part of the government creates strong suspicions or well-grounded suspicions that the vessel seized as being employed in the slave-trade was fitted out or fitting out for that purpose, such evidence must produce her conviction and condemnation unless rebutted by clear and satisfactory proofs on the part of the claimants, showing her voyage to be a lawful one. In another of those cases, The Reindeer, 2 Wall. [69 U. S.] 383,

the supreme court say: "Suits of this description necessarily give rise to a wide range of investigation, for the reason that the purpose of the voyage is directly involved in the issue. Experience shows that positive proof in such cases is not generally to be expected, and for that reason, among others, the law allows a resort to circumstances as the means of ascertaining the truth. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." In the case of Clifton v. U. S., 4 How. [45 U. S.] 242, which was a libel of information on a seizure for the fraudulent undervaluation of goods in an invoice, the circuit court instructed the jury that "to withhold testimony which it was in the power of a party to produce in order to rebut a charge against him, where it was not supplied by equivalent testimony, might be as fatal as positive testimony in support or confirmation of the charge," and "that if the claimant had withheld proof which his accounts and transactions with these parties afforded, it might be presumed that, if produced, they would have operated unfavorably to his case." This instruction having been excepted to by the claimants, the case was taken to the supreme court by writ of error. Mr. Justice Nelson, in delivering the opinion of that court, says, in regard to these instructions: "They were not only quite pertinent to the question in hand, but founded upon the well-established rules and principles of evidence. The prosecution involved in its result not only the forfeiture of a considerable amount of property, but also the character of the claimant, both as a merchant and an individual. He was charged with a deliberate and systematic violation of the revenue laws of the country by means of frauds and perjuries, and the court had pronounced the proof sufficient to establish the offence unless explained and rebutted by opposing evidence. Under these circumstances, the claimant was called upon by the strongest consideration, personal and legal, if innocent, to bring to the support of his defence the very best evidence that was in his possession or under his control."

Much reliance was placed by the counsel for the claimant, in his summing up, upon the doctrine supposed by him to have been laid down by the supreme court in the case of The Santissima Trinidad, 7 Wheat. [20 U. S.] 283. That doctrine was stated by the counsel in various forms, but the principle contended for was that freedom of commerce is allowed to a neutral to furnish to a belligerent warlike materials or warlike vessels as articles of merchandise or traffic; that while the principle of the law of nations is recognized, which prohibits neutral territory from being used by either belligerent as a vantage-ground from which he may sally forth to commit hostilities upon the other

belligerent, yet the right of citizens of the neutral country to sell all that their industry produces for purposes of war, as fair matter of trade, to any belligerent, cannot be interfered with, that it is no offence and no violation of neutrality to sell a vessel of war, armed or not armed, in our ports, to a belligerent power; and that there is the same right under the law of nations, to sell in our ports an armed vessel, under such circumstances, that there is to sell guns or ammunition or any other raw material. At another stage of his argument, the counsel maintained the proposition, that unless it appeared affirmatively that the vessel was to sail out from the port of New York as an enlisted hostile ship of one belligerent, there was no criminality, although it should be made to appear by indisputable proof that she had been built, fitted, armed, and equipped as a ship of war, complete and ready for action.

The views thus pressed upon the court have, in its judgment, no foundation in public law, or in any decision that has been made by the highest judicial tribunal of the United States. The case of The Santissima Trinidad was decided by the supreme court at the February term, 1822. It was a libel filed by the consul of Spain, in the district court of Virginia, in April, 1817, against certain property originally constituting a part of the cargo of the Spanish ship Santissima Trinidad, which was alleged to have been unlawfully and piratically taken out of that vessel on the high seas, by a squadron consisting of two armed vessels called the Independencia del Sud and the Altravida, and manned and commanded by persons assuming themselves to be citizens of the United Provinces of the Rio de la Plata, commonly called the government of Buenos Ayres. The libel was filed by the consul on behalf of the original Spanish owners of the property, and claimed the restitution of the property principally upon three grounds,—First, that the commanders of the capturing vessels were native citizens of the United States, and were prohibited by our treaty with Spain of 1795 from taking commissions to cruise against that power; second, that the capturing vessels were owned in the United States and were originally equipped, fitted out, armed and manned in the United States, contrary to law; third, that their force and armament had been illegally augmented within the United States. The district court decreed restitution of the property, and the circuit court affirmed the decree, and the case was then taken by appeal to the supreme court. That court (Mr. Justice Story delivering its opinion) decided that the Independencia was in point of fact a public ship belonging to the government of the United Provinces, and that all captures made by her were to be regarded as valid. It appeared that the property in question was captured by the Independencia alone, and the Altravida being a tender, or despatch ves-

sel, to the Independencia. The supreme court also decided that the evidence showed that there had been a clearly illegal augmentation of the forces of the Independencia and the Altravida, within the jurisdiction of the United States, by an increase of their crews there, prior to the capture in question, and that such illegal augmentation was a violation of the laws of nations as well as of our own municipal laws; and required restitution to be made of the property subsequently captured by the vessels. The court, therefore, affirmed the decree of the circuit court. In the course of his opinion Mr. Justice Story discusses the point taken, that the Independencia was originally armed and fitted out in the United States contrary to law, and says: "It is apparent, that though equipped as a vessel of war, she was sent to Buenos Ayres on a commercial adventure, contraband indeed, but in no shape violating our laws, or our national neutrality. If captured by a Spanish ship of war during the voyage, she would have been justly condemnable as a good prize, for being engaged in a traffic prohibited by the law of nations. But there is nothing in our laws, or in the law of nations, that forbids our citizens from sending armed vessels, as well as munitions of war, to foreign ports for sale. It is a commercial adventure which no nation is bound to prohibit, and which only exposes the persons engaged in it to the penalty of confiscation. Supposing, therefore, the voyage to have been for commercial purposes, and the sale at Buenos Ayres to have been a bona fide sale (and there is nothing in the evidence before us to contradict it), there is no pretence to say that the original outfit on the voyage was illegal, or that a capture made after the sale was, for that cause alone, invalid." These views of Mr. Justice Story were, as is apparent from the statement which has been made of the case, obiter dicta, and not necessary to the decision of the cause, restitution of the property being decreed upon the ground of the illegal augmentation of the force of the capturing vessel in our ports prior to the capture. The facts in regard to the commercial adventure of the Independencia, referred to by Mr. Justice Story, as they appear in the report of the case, were, that that vessel, having been a privateer during the war between the United States and Great Britain, was, after the peace, sold by her original owners, and loaded by her new ones, at Baltimore, in January, 1816, with a cargo of munitions of war; that she sailed from Baltimore with them, and armed with twelve guns, part of her original armament, to Buenos Ayres, under written instructions from her owners to her supercargo, authorizing him to sell the vessel to the government of Buenos Ayres, if he could obtain a suitable price; and that she was sold at Buenos Ayres to parties who again sold her, so that she became a public commissioned vessel of the government of Buenos Ayres. It was on these facts that

Judge Story remarked that the vessel, though equipped as a vessel of war, was sent to Buenos Ayres on a commercial adventure in no shape violating our laws or our national neutrality, in that there is nothing in our laws, or in the law of nations, that forbids our citizens from sending armed vessels to foreign ports for sale. If the Messrs. Forbes, or any of the owners of the Meteor, or Mr. Cary, their agent, or any of the parties concerned in the transactions in regard to the Meteor, had testified before the court, on this trial, that the Meteor was going out to Panama on a purely commercial adventure, to be sold there, if a suitable price could be obtained, and if it appeared that there was no intent on the part of the owners, or any other person, that the vessel should be used to violate the neutrality of the United States, there might be some pretence that this case was within the principle thus laid down by Mr. Justice Story. But the whole testimony points in a different direction. The transaction with the agents of Chile at New York, in regard to the Meteor, was, it is true, a commercial adventure, in so far that the vessel was sold, and that such sale was a matter of trade or commerce at New York, between her owners and the agents of the government of Chile. But, in the sense in which Mr. Justice Story speaks of the sending of the Independencia to Buenos Ayres on a commercial adventure, there was no commercial adventure in the case of the Meteor.

What the supreme court regard as not being a commercial adventure is shown by the opinion of that court, delivered by Chief Justice Marshall, in the case of The Gran Para, 7 Wheat. [20 U. S.] 471, which came before that court at the same term as the case of The Santissima Trinidad [supra]. It was a libel filed in the district court of Maryland, by the consul-general of Portugal, praying for the restitution to Portuguese owners of a quantity of gold and silver coin alleged to have been taken from the Portuguese ship Gran Para by a private armed vessel called the Irresistible, fitted out in the United States in violation of the neutrality acts. It appeared that the Irresistible was built as a war vessel in the United States, and sailed from Baltimore for Teneriffe, between February and June, 1818, with a crew of fifty men, and with cannon, small arms and ammunition in her hold, entered outwards as cargo; that she proceeded to Buenos Ayres, and was commissioned as a vessel of the government of Buenos Ayres, to cruise against Spain, and sailed from Buenos Ayres on a cruise, in June, 1818; that the next day her master produced a commission from the chief of the Oriental Republic, to cruise under that commission, and sent back the commission of the government of Buenos Ayres; that during the cruise the money in question was captured; and that the Irresistible subsequently brought the money to Baltimore. Chief Justice Marshall, in his opinion, says: "That the Irre-

sistible was purchased, and that she sailed out of the port of Baltimore, armed and manned as a vessel of war, for the purpose of being employed as a cruiser against a nation with whom the United States were at peace, is too clear for controversy. That the arms and ammunition were cleared out as cargo cannot vary the case. Nor is it thought to be material that the men were enlisted in form as for a common mercantile voyage. There is nothing resembling a commercial adventure in any part of the transaction. The vessel was constructed for war, and not for commerce. There was no cargo on board but what was adapted to the purposes of war. The crew was too numerous for a merchantman, and was sufficient for a privateer. These circumstances demonstrate the intent with which the Irresistible sailed out of the port of Baltimore. But she was not commissioned as a privateer, nor did she attempt to act as one, until she reached the river La Plata, when a commission was obtained and the crew re-enlisted. This court has never decided that the offence adheres to the vessel, whatever changes may have taken place, and cannot be deposited at the termination of the cruise in preparation for which it was committed; and, as the Irresistible made no prize on her passage from Baltimore to the river La Plata, it is contended that her offence was deposited there, and that the court cannot connect her subsequent cruise with the transactions at Baltimore. If this were to be admitted in such a case as this, the laws for the preservation of our neutrality would be completely eluded, so far as their enforcement depends on the restitution of prizes made in violation of them. Vessels completely fitted out in our ports for military operations need only sail to a belligerent port, and there, after obtaining a commission, go through the ceremony of discharging and re-enlisting their crew, to become perfectly legitimate cruisers, purified from every taint contracted at the place where all their real force and capacity for annoyance were acquired.[4] This would, indeed, be a fraudulent neutrality, disgraceful to our own government, and of which no nation would be the dupe. It is impossible for a moment to disguise the facts, that the arms and ammunition taken on board the Irresistible at Baltimore were taken for the purpose of being used on a cruise, and that the men there enlisted, though engaged in form as for a commercial voyage, were not so engaged in fact. There was no commercial voyage, and no individual of the crew could believe that there was one. Although there might be no express stipulation to serve on board the Irresistible, after her reaching the La Plata and obtaining a commission, it must be completely understood that such was to have been the fact. For what other purpose could they have undertaken this voyage? Everything they saw, everything that was done, spoke a language too plain to be misunderstood." The court af-

firmed the decree restoring the money, on the ground that it had been captured by a vessel which had violated our neutrality law. The court held that the Irresistible came within the prohibitions of that part of the third section of the neutrality act of June 5, 1794 (1 Stat. 383), which makes it penal for any person, within any waters of the United States, to be knowingly concerned "in the furnishing, fitting out or arming of any ship or vessel with intent that such ship or vessel shall be employed in the service of any foreign prince or state, to cruise or commit hostilities upon the subjects, citizens or property of another foreign prince or state with whom the United States are at peace." The court also referred to the fact that the neutrality act of March 3, 1817 (3 Stat. 370, § 1), adapts the previous laws to the actual situation of the world, by adding to the words "of any foreign prince or state," in the third section of the act of 1794, the words "or of any colony, district, or people." The third section of the act of April 20, 1818, is in substance the same with the first section of the act of 1817. The Meteor, although she did not have on board of her, when seized, any cannon, small arms or ammunition, except the boxes of cannon-shot testified to by the witness Sease, was not, on the evidence, really engaged any more in a commercial adventure, in taking out her clearance for Panama, than was the Irresistible in her voyage to Buenos Ayres. The Meteor, although not completely fitted out for military operations, was a vessel of war, and not a vessel of commerce. She had in no manner been altered from a vessel of war so as to fit her to be only a merchantman, and so as to unfit her to be a vessel of war. It needed only that she should reach a point beyond the jurisdiction of the United States, and there have her armament and ammunition put on board of her to become an armed cruiser of the Chilian government against the government of Spain. To permit a transaction of the kind shown by the proofs in this case to be consummated, would, in the language of Chief Justice Marshall, in the case of The Gran Para [supra] be "a fraudulent neutrality."

The case of Moodie v. The Alfred, 3 Dall. [3 U. S.] 307, decided by the supreme court at the August term, 1796, was pressed, upon the argument, by the counsel for the claimant, as sanctioning the freedom of commerce for which he contended. In that case, a British prize had been taken by a French privateer and sent into Charleston. The privateer had been built in New York, with the express view of being employed as a privateer against Great Britain, in case there should be a war between the United States and Great Britain. Some of the equipments put upon her in New York were calculated for war, though they were frequently used for merchant ships. She was sent to Charleston, where she was sold to a French citizen. He carried her to a French island, where she was completely armed and equipped and furnished with a commission, and she afterwards sailed on a cruise, during which the prize in question was taken. It was contended, in that case, that the original construction or outfit of the privateer was an original construction or outfit of a vessel for the purposes of war, and that therefore, the capture of the prize was illegal; but the court overruled this view. That case affords no countenance to the doctrine in support of which its authority is adduced. The only fact appearing in the case bearing on the illegality of the transaction was, that the vessel was built in the United States, was furnished there with some warlike equipments, and was there sold to a French citizen. But the main ingredient was wanting of any furnishing, fitting out or arming of the vessel with intent that she should be employed in the service of France, to cruise or commit hostilities upon the subjects or property of Great Britain. She was built with the intent to cruise in the service of the United States against Great Britain in the contingency of a war between those two powers, and no circumstance appears in connection with the sale of the vessel, except that she was sold in the United States to a French citizen. If it had been shown that she was purchased by the French citizen with intent to employ her in the service of France to cruise against Great Britain, the case might have been a different one, and the decision might have been different; but the case as it stands furnishes no support to the doctrines urged by the counsel for the claimant. Nor is there anything to be found in the decision of the supreme court in the case of U. S. v. Quincy, 6 Pet. [31 U. S.] 445, which sanctions those doctrines. According to that decision, the question of intent is the main question under the neutrality law, and, as the court say, "all the latitude necessary for commercial purposes is given to our citizens, and they are restrained only from such acts as are calculated to involve the country in war."

The sale of a fully armed vessel of war in the United States to a belligerent government, or to a subject or citizen of such government, may be, as a naked act, lawful and no offence against the law of nations or the statutory law of the United States; but, if such vessel passes virtually, and to all practical intents and purposes, in the United States, into the control of the belligerent power, or of its subject or citizen, with the intent on the part of those concerned in putting the vessel under such control that she shall be employed in the service of the belligerent power, to cruise or commit hostilities against the subjects, citizens or property of a power at war with such belligerent and at peace with the United States, the neutrality of the United States is compromised, and the neutrality law of the United States is violated. To say that, with such an intent proved in the sale of the vessel, nothing has been done in violation of the

third section of the act of 1818, is to make such section virtually a dead letter. The doctrine contended for would result in this,—that the building and arming of the vessel would be perfectly lawful, because, in building and arming her, there was no intent to have her unlawfully employed; and the sale would be perfectly lawful, although such intent existed at the time of the sale, because no such intent existed when she was built or armed; and no interference could be had with her after the sale because, as she was fully armed and equipped at the time of the sale, it would be unnecessary to do anything to her after the sale to enable her to cruise or commit hostilities. This consequence would follow; not only in respect to a vessel fully armed, but in respect to one which had been merely attempted to be fitted out and armed, and in respect to one which had been only partially fitted out and armed. The intent is, under the third section, the thing which marks the offence. If the prohibited intent does not exist, a citizen of the United States may not only sell a fully armed vessel in a port of the United States to a belligerent power, or to a subject or citizen of such power, but may also send a fully armed vessel to a foreign port for sale as a purely commercial adventure. To say that the neutrality laws of the United States have never prohibited the sale of a vessel of war as an article of commerce is merely to say that they have not prohibited the fitting out and arming, or the attempting to fit out and arm, or the furnishing or fitting out or arming, of a vessel within the limits of the United States, provided the unlawful and prohibited intent did not exist.

The language of the act of 1818 is not ambiguous, and does not admit of any latitude of construction, nor is there any provision in any section of it conflicting with any provision in any other section of it. It is, therefore, unnecessary to look outside of the statute for any aid in arriving at the intention of the legislature in its enactment. While it is the duty of the court, in interpreting a statute, to effect the intention of the legislature, that intention must be searched for in the words which the legislature has employed to convey it. Where the language of an act is explicit, there is a great danger in departing from the words used to give to the law an effect which may be supposed to have been designed by the legislature. The Paulina's Cargo v. U. S., 2 Cranch [6 U. S.] 52; Denn v. Reid, 10 Pet. [35 U. S.] 524. When, as in the present case, such intention is, in the face of the statute, not at all ambiguous, the court cannot look elsewhere than into the statute itself for any aid in interpreting it. These considerations dispose of any argument in favor of the interpretation urged by the counsel for the claimant, drawn from a history of the neutrality acts of the United States, and the condition of the foreign relations of the United States, at the time of the enactment of the statute, and the political correspondence of the public authorities of the United States, and the discussions in congress preliminary to the passage of the act.

The importance of this case, not merely in view of the pecuniary value of the vessel proceeded against, but also in respect to the principles of public law involved in it, has led the court to a more extended discussion of those principles than would otherwise have been necessary. The court, however, entertains no doubt as to the correctness of the doctrines of public law which it has applied to the present case. Those doctrines are the result of the legislative, executive and judicial action of the public authorities and courts of the United States in a great variety of cases, and the court has nowhere found a more excellent summary of them than in Wheat. Int. Law (8th Ed.) with notes by Dana, pp. 562, 563, note 215: "As to the preparing of vessels within our jurisdiction for subsequent hostile operations, the test we have applied has not been the extent and character of the preparations but the intent with which the particular acts are done. If any person does any act, or attempts to do any act, towards such preparation, with the intent that the vessel shall be employed in hostile operations he is guilty, without reference to the completion of the preparations or the extent to which they may have gone, and although his attempt may have resulted in no definite progress towards the completion of the preparations. The procuring of materials to be used, knowingly and with the intent, &c., is an offence. Accordingly, it is not necessary to show that the vessel was armed, or was in any way, or at any time, before or after the act charged, in a condition to commit acts of hostility." "Our rules do not interfere with bona fide commercial dealings in contraband war. An American merchant may build and fully arm a vessel, and provide her with stores, and offer her for sale in our own market. If he does any acts, as an agent or servant of a belligerent, or in pursuance of an arrangement or understanding with a belligerent, that she shall be employed in hostilities when sold, he is guilty. He may, without violating our law, send out such a vessel, so equipped, under the flag and papers of his own country, with no more force of crew than is suitable for navigation, with no right to resist search or seizure, and to take the chances of capture as contraband merchandise, of blockade, and of a market in a belligerent port. In such case, the extent and character of the equipments is as immaterial as in the other class of cases. The intent is all. The act is open to great suspicions and abuse, and the line may often be scarcely traceable; yet the principle is clear enough. Is the intent one to prepare an article of contraband merchandise, to be sent to the market of a belligerent, subject to the chances of cap-

ture and of the market? Or, on the other hand, is it to fit out a vessel which shall leave our port to cruise, immediately or ultimately against the commerce of a friendly nation? The latter we are bound to prevent. The former the belligerent must prevent." The evidence in the present case leaves no rational doubt that what was done here in respect to the Meteor, was done with the intent that she should be employed in hostile operations in favor of Chile against Spain, and that what was done by her owners towards despatching her from the United States was done in pursuance of an arrangement with the authorized agents of Chile for her sale to that government and for her employment in hostilities against Spain, and that the case is not one of a bona fide commercial dealing in contraband of war.

With these views, there must be a decree condemning and forfeiting the property under seizure, in accordance with the prayer of the libel.

[The case was taken, on appeal, to the circuit court where a decree was entered reversing this court and dismissing the libel. Case No. 15,-760.]

[The following note is reprinted from 3 Am. Law Rev. 234.]

NOTE. On the 23d January, 1866, the steamship Meteor, lying at her wharf in New York, was seized by the United States marshal, by virtue of a warrant filed by the United States district attorney, in the district court for the Southern district of New York. The libel charged that the Meteor had, within the jurisdiction of the court, been furnished and fitted out, or attempted to be fitted out, by persons to the district attorney unknown, with the knowledge and intent that she should be employed in the service of the government of Chili, to cruise and commit hostilities against the subjects and property of the government of Spain (with which power we were then at peace), contrary to the third section of the act of congress, approved April 20, 1818, commonly called the "Neutrality Act."

On the 14th March following, Mr. Evarts, of counsel for the owners moved to have the vessel appraised and released to them on bond, according to the customs in causes in admiralty on the instance side of the court. He supported his motion on the ground, that it was matter of ordinary right in such causes. He adduced the analogy in the practice under the slave trade act, and the piracy act; and urged that a privilege never withheld from the nefarious traffickers in human beings ought not, certainly, to be refused to men of the well-known high standing and integrity of the owners of this vessel, constructed, as she has been, upon the most patriotic motives. The district attorney, in reply, argued that the neutrality act was a complete whole in itself, which in some cases directly authorized bonding, and in others by a necessary implication withheld the privilege. He suggested that to bond the vessel was simply to set her free at once to depart upon her illegal cruise. He further insisted that even if the court had power to bond the ship, it was, at least, a matter of judicial discretion; and as a consideration, which in this view would be "fatal to the motion," he read and "made part of his argument" certain letters from the state department, embodying "instructions" to himself. Probably no error can be committed in construing the contents of these letters as the district attorney himself construed them; that is to say, as imperative exhortations to use all the machinery

of the law for the purpose of securing the forfeiture of this vessel. In the same connection, he argued strenuously, as a fact which "ought to have some bearing on the question now before the court," that an application had been made to the state department to release the vessel, and been refused. This matter and the "instructions" of the letter were dwelt upon at length and emphatically; and thus, at this early stage in the proceedings, the government counsel, with a faint deprecation, took the ground, which they afterwards deliberately and distinctly assumed, that the whole was an affair of state, rather than a question of law, and that the judge was for the purposes of this cause, not so much a judicial magistrate as a political subaltern.

Mr. Evarts replied. He said that the court had no precautionary power which could be exerted to prevent any further offence by the vessel; that such power, in an ample degree, was lodged with the executive. That the bonding was a matter of obligation, not of discretion; but, if it should be held matter of discretion, he stated facts which he thought should induce the court to grant his motion. In reference to the application stated to have been made to the state department, he explained that it was only an application for the entire discontinuance of the suit and absolute release of the vessel, grounded on the belief of the owners that the government "in plain view of the rights and purposes of the owners, could not seriously intend to make it a matter of judicial inquiry;" that the request was properly preferred to the executive, within whose province lay the duty of deliberation and the power of control as to whether the suit should go on or be discontinued; that the owners had never "asked the government, by any intimation of its wishes, to affect the court's direction and conduct of questions arising in the prosecution;" that if the prosecuting attorneys insisted upon having the secretary of state and the president "heard on questions touching the due administration of justice, except by argument and in methods for which the law provided," then they "introduced an impropriety into the administration of justice," not justified by the secretary's letter, and which the "judiciary of the United States would not submit to tolerate for a single moment."

On the 23d March, the opinion of the court was rendered, refusing the motion. The position taken was, that the statute itself was conclusive to the effect that "the vessel, while held under seizure by process in favor of the United States for the violation of that statute, cannot be discharged on bail by order of a judge of the United States under the authority of the common rules and practice of this court." . . . That the "clear purport and intent" of the statute was that "the vessel [should] herself be detained, so that the forfeiture, which is the penalty, &c., may be forced against her specifically in case of condemnation." The court thus decided that it had not the power to bond the vessel at this time when she had in her favor the legal presumption of innocence. Soon afterwards the trial upon the merits was had, and the court pronounced a decree of condemnation. Thereupon the vessel became tainted with guilt, and the necessity of enforcing the forfeiture "against her specifically" seemed then to be in a fair way to be executed. But just at this juncture the judge reversed his former decision, and the decree of condemnation was promptly followed by an order that the Meteor should be appraised and bonded, if her owners so wished. It was accordingly done, and she was released. No opinion was delivered, either at the time or afterwards; no reasons or explanation were vouchsafed for this astonishing contradictory action. The record simply remains thus: On 23d March, the court had no legal power to bond the vessel which was then presumably innocent; on 20th July, it bonded her after she had been adjudged guilty. We of the outside are remitted to our own cleverness to account for these

strange series of incongruous acts. No new law, no new legislation, occurring between March 23d and July 20th, aids us.

To take up again the thread of the history of the case, we will go back to the 28th March. On this day the trial of the case began. The vessel was then still in the custody of the United States marshal. The substance of the evidence adduced by the government was briefly as follows: The Meteor was a swift seagoing steamship; she was built by a number of public-spirited citizens, with the intention of offering her to the United States government, for the purpose of pursuing and destroying the Alabama; to this end she was capable of carrying a moderate armament; but her chief merit lay in her speed, to which every other consideration had been made subordinate. Before she was finished, the need for such vessels had ceased. She had since been used by government as a transport ship for troops, and afterwards had been employed as a freighting vessel, in the merchant service, between home ports. Originally two Parrot guns had been placed on board her, which had been subsequently removed; and beyond this, she had received no warlike equipment whatsoever. She had on board 750 tons of coal, being about 12 tons per day for the shortest voyage to Panama, and provisions for six months, a portion of which were marked "reserved stores." She was for sale for several months. There was war between Spain and Chili, pending which a certain accredited agent of Chili, in New York, wished to buy stanch seagoing steamers; the Meteor, among others, attracted his attention (though through no act of her owners), and suited his purpose. Three "adventurers," of that nondescript hand-to-mouth occupation which furnishes a mysterious livelihood to so many inhabitants of large cities, sought to get a handsome commission, by bringing about a sale of the Meteor to this Chilian agent. One of these men was an army and navy claim agent, interested in petroleum and mining stocks; the other sometimes "speculated in oil stocks," and had been a "bounty broker." For want of ready money, their efforts ended only in egregious failure, as they themselves very freely acknowledged. The owners, the Messrs. Forbes, were ready and willing to sell the vessel to this Chilian agent; but she was to be sold and delivered in precisely the condition in which she was then lying at the wharf, for the full price in cash down. This money could not be thus raised. The whole plan, for this reason, fell through; and the negotiations conclusively ceased. The vessel, with the coal and provisions before named, was cleared or about to clear for Panama, when she was seized under the libel. The informer was one of the three dissappointed adventurers. The evidence was explicit to the effect that in the negotiations with the Messrs. Forbes, nothing was for a moment contemplated, save an outright sale of the vessel as she lay for cash down in full. It was further explicit and consistent, to the effect that the negotiations concerning the sale were understood by all parties to have been finally and totally abandoned, without having accomplished anything, a long time before the seizure. The only connection between the three middle-men, or "runners" as they were called on the trial, and the owners of the vessel, consisted in two or three visits of inquiry made by the middle-men, to a shipbroker, who communicated the offers made to him for the ship to the New York agent of the owners, and who received authority from him to sell her upon the terms above stated.

To breathe into these historical facts, in themselves apparently innocent, a guilty life, the district attorney and his associate counsel relied upon testimony which they were permitted to introduce contrary to the strict rules of law: because, as they frankly stated, unless this permission was accorded to them, they should be quite unable to make out their case. The evidence which was admitted through the door of this cogent necessity was as follows: One witness testified that a man who looked very like a stevedore, but who might, nevertheless, have been some other species of laborer, told him that the ship was going to Chili. The same witness was allowed to add that "stevedores were apt to know" the destination of vessels. One Conkling, the man who had stated himself to be an "oil speculator" and "bounty broker," was even permitted to state that one man had said to another man, that "he believed" the arrangement for the sale of the vessel had been completed by a third individual. It was further shown, that when the vessel was seized, with her steam up, Captain R. B. Forbes was on board; that he said he was sorry to lose his trip down the Narrows; called for his carpet bag, received from the errand boy a small black hand-bag, and went ashore; that afterward, as he was crossing on the ferry boat, he encountered a seafaring man. This man was placed on the stand, and stated substantially, that when he met Mr. Forbes, he "wanted to talk;" that he had himself been actively urging some of the third parties to put him in command of the ship, if they should succeed in buying her, and that he was disappointed at the non-success of his demands. In other words, this "captain" was an American citizen, who had been disappointed in the laudable design of becoming a Chilian privateersman. In a loud tone the "captain" said to Mr. Forbes, that he thought the Meteor was going to Chili; Mr. Forbes said she was bound or cleared for Panama; the other responded, that if she had gone to Chili, he had supposed that he should have gone in command of her. The folly of this speech, which, however harmless for others, might have been damaging to the speaker, was rebuked by Mr. Forbes, with the admonition that the captain had better not make such remarks in so high a tone. Further, it was stated that Captain Kemble, in command of the Meteor when she was seized, and previously, had been heard to say that if she was sold, he should take her out to Panama and there deliver her over to a "fighting captain." Besides this, the tale of the fiasco of the three disappointed adventurers was narrated in full. In the course of the narration, hearsay testimony was introduced by wholesale, when the very witnesses who could have given it at first-hand were sitting in the court-room. Neither was any link established between this story, which was a thing of the past, that had found its death and burial in empty words and nothing more, and the subsequent condition and history of the vessel. On this ground, the defendants' counsel took exception to the admission of that part, even, which was not hearsay; objecting that it related wholly to a separate, distinct, and completed transaction, having no bearing upon or connection with any fact that could be proved, or had been offered, or attempt to be proved, against the vessel under the libel.

Upon this evidence the government rested its case. Mr. Evarts then rose and stated that it was not his intention to introduce any testimony, inasmuch as he was fully satisfied with that given by the witnesses called by the government. We do not propose to dwell upon the arguments at any great length. The ground assumed by the government counsel was double: they urged that, under the law as it stood, the facts warranted a decree of forfeiture. The strongest point which they made in this branch of their argument ought, perhaps, to be briefly suggested, for it was so subtle and ingenious, though withal so weighty and pregnant, that it might escape the attention of the reader, and fail to meet that consideration which it deserves, and which Judge Betts awarded to it. As oaks from acorn grow, so this theory in all its completeness sprouted from the little piratical-hued carpet bag of contents unknown, or at least unproved. It was suggested that this bag contained the muniments of title of the ship; that Mr. Forbes was going with her outside of Sandy Hook; that there he was going to make formal delivery of her, with all the legal documents, to certain agents of the Chilian government, who

were to turn up from somewhere and be outside Sandy Hook; that when Mr. Forbes would return, and from some source not known, or at least not named by the government, an armament would be put on board the vessel; that she would then hoist the Chilian flag and begin her career of destruction. The whole story had the incontrovertible force of being a physical possibility. If true, it would certainly have plunged the owners deep into a guilty collusion with a belligerent purchaser. While the ingenuity of the conception challenges admiration, the question, whether or not this elaborate plan, with all its minute details, could be considered as reasonably proved to the conviction of an ordinary mind, by the appearance of the carpet bag. with its peculiar traits of size and color, is a matter on which each of our readers must make up his own mind. Whatever each one may decide, none will fail to draw the obvious moral against carrying small hand-bags.

The second ground of the government counsel was purely diplomatic. In this branch of their argument, they urged, that, if the law had been previously against them, yet the necessities of the nation now required that this law should be changed: Referring directly to the Anglo-rebel cruisers, they said that "public reasons" demanded "an interpretation" of the act, such as would make their case good. The leading case on the subject is that of the Santissima Trinidad. The famous ruling of Judge Story, in his opinion delivered in that case, has always since been assumed by judges, lawyers, and publicists as laying down what had before been supposed to be the sound law in such matters, and what could never, after the publication of that opinion, be doubted. This obstacle it was thought more advisable to crush beneath the juggernaut car of the state department, than to seek to undermine or circumvent by legal subtlety. The language used in discussing it was as follows: "If the supreme court maintains the broad dictum of the Santissima Trinidad, after the late positive utterances of the department of state on that very point, there will be a conflict of opinion between the executive and judicial departments of the government, on a matter of international law, not at all creditable to the United States, which, since its peremptory demand on England for indemnity for losses occasioned by Anglo-rebel cruisers, cannot well change its attitude."

From this pregnant text issued a long, urgent, elaborate, politico-diplomatic argument, crammed full of the various phases of the Alabama discussion, and the present position and real or supposed needs and wishes of the secretary concerning the same. In speaking thus of these diplomatic features of this trial, we are advancing no novel views. Severe animadversions upon them have been reiterated again and again in other quarters. But we do not wish to be understood as undertaking to utter such animadversions. Neither do we wish to be understood as making any unreasonable imputation against the motives of either the counsel or the judge. There can be no question that they were actuated solely by a regard to what they supposed to be the public good. They conceived that they had the best authority for believing that the condemnation of the vessel would be a national advantage, that it could almost be called a national necessity, in view of the great aid which this condemnation would furnish in the negotiations with England. Their patriotic anxiety probably blinded their eyes to the obvious impropriety of introducing such arguments as those which we have narrated above, into legal proceedings which could properly deal only with the facts in evidence and the law bearing upon them. But it would seem to be shown by the history of this case that the question, whether or not it is justifiable to seek to change the established interpretation of a statute, and to overrule decisions, on the ground of public utility, is one of legal ethics on which honorable members of the profession are able to differ.

When the case came upon appeal before Mr. Justice Nelson, it was for the first time stripped of such foreign accompaniments, and was tried by that eminent judge upon the sole basis of its legal merits. It is at this stage that the case becomes very valuable to the profession. Judge Nelson is probably the first authority in the land upon questions of marine and commercial law. His rulings in this case were clear and decisive, and were given without any expression of doubt. It was a piece of great good fortune that the cause fell within his circuit. The evidence which we have above commented upon as hearsay, and a part of which we have narrated, had been admitted by Judge Betts on the ground that it was the testimony of some of several co-conspirators against others. Judge Nelson disposed of it briefly in the statement, that "the principle that Judge Betts lays down is all right; but it does not cover the evidence that was allowed." Referring to the evidence of Conkling, above stated, he suggested, with a certain satirical humor, that "if you want to prove what a person has said, you cannot prove it by one man saying that another said he had said it."

On the matter of the sufficiency of the proof offered, Judge Nelson stated that he regarded it as absolutely indispensable for the government to show some outfit of a warlike nature; some furnishing which had prepared, or aided in preparing, the vessel for belligerent use. Coal and provisions, to the amount which she was shown to have had on board, he did not consider as constituting such a furnishing or fitting out as was contemplated by the use of these phrases in the act. If a simple sale was legal, he said, and that it was so admitted by the government counsel, then fuel and provisions were a necessary concomitant to enable the vessel to leave the port. The naked right of sale, unless it included these indispensable privileges, was an utter nullity. It was ex necessitate rei that if she could be legally sold, she could be legally delivered, and if coal and provisions were requisite to make delivery possible, they could be legally placed on board her. The judge said, "These owners had a right to sell the ship, and the government must make out that she has been fitted and equipped for a military or naval expedition . . . It must be an arming or fitting out for war purposes . . . I do not see any evidence of that fitting out . . . I agree that if the agents of a hostile government should make a contract to build a ship for service in war, then suspicion would commence in the origin of the contract, and very slight circumstances might go to make out the purpose and the intent. But this vessel was built as a war vessel for our own government. Being no longer required for that use the owners had a right to sell her; and therefore, having that right, the mere fact that stores were put on board of her, that were necessary to convey and transfer her abroad to the parties to whom she was sold, forms no ground of suspicion at all; because the right to sell carried with it the right to put on board these provisions and stores. In order to make out that there was a hostile purpose intended, as an expedition against a country with which we were at peace, in violation of this law, you must show there was some fitting out, in the military or naval sense, with intent to commit this hostile act against a government with which we were at peace . . . I do not see that you have made out anything. No munitions of war on board and no evidence that any were to be put on board . . . There was nothing illegal in the furnishing of stores and supplies,—nothing in the act to forbid it. You must connect this with the military or naval expedition, which you have not done . . . I cannot decide this case on conjecture or suspicion . . . I have been waiting for you to show any naval equipment, either in fact or intention." The judge proceeded to say, that, since the prosecuting counsel acknowledged that the vessel might be legally sold to the Chilian government, he

thought, with their evidence, "they might as well give up their case." The want of any proof even that there had been a sale, the judge stated, was one of his "troubles in the case." It was his own impression, from the evidence, that there had been no sale; an opinion, which later in the progress of the cause, he stated decisively. But at any rate, he said, it was a "transparent" fact that there was "no evidence of fitting out within the sense of the act."

Much extraneous matter having been thus cleared away, the judge came to the consideration of the important point of the intent. He said, "I think the only question in the case is one of intent." He considered that the vessel had undoubtedly been furnished with stores and fuel by the owners, with the intent to carry her to Panama, and there or elsewhere, to sell her "to the Chilian government, if they could, or anybody else; knowing, if they sold her to the Chilian government, that she would be employed in the war between Chili and Spain." If this knowledge of the result to be expected upon the fulfilment of a contingency, was a breach of the act, the government had made out its case. Judge Betts had declared that it was so. In other words, he had declared that a knowledge of the use to which she would be put was equivalent to, and identical with, an intent that she should be put to that use, as the phrase "intent" was to be construed in the act. That is to say: A sale is legal; but if the seller knows that the thing sold will be used for the purpose for which it is made, and to which it is adapted, the sale is illegal. The reductio ad absurdum is evident. It was well put by Judge Nelson: "I cannot imagine a sale to a government at war that can be upheld upon that doctrine; because, while as a mere commercial transaction the sale of a war vessel is conceded to be legal, yet if you connect with it that the vessel is known to be used by the belligerent against his enemy, then it is illegal. That I understand to be the doctrine of Judge Betts. I do not see, therefore, but that he virtually annuls the right to sell." This point is, doubtless, the most important in the case. It is the point of divergence between the case of the Meteor and the cases of the rebel cruisers. It is the distinction which leaves the former innocent, and makes the latter guilty. The correctness of Judge Nelson's views seems obvious almost to the degree of an axiom. To say that a man may sell a knife, but that he shall not do so if he knows that it will be used to cut with, is an imbecility. Yet the legality of simple sales of war vessels to a belligerent, is a privilege which congress has insisted upon preserving to all American citizens. The history of the legislation on the subject is at once instructive and conclusive. The first neutrality act was passed in 1794. The case of The Mermaid [Case No. 1,897] and the case of Moodie v. The Alfred, 3 Dall. [3 U. S.] 307, which was probably the same case under a different name, decided that under this act a sale of a war vessel to a belligerent was legal. The further legislation in 1797, subsequent to both these decisions, made no change in the act in this respect. In 1816, during the long war between Spain and her South American colonies, the Spanish minister to this country was anxious to have the sale of war vessels wholly prohibited. President Madison consulted Attorney General Rush, concerning the force of the existing law. In the opinion which Mr. Rush returned, he said: "I am aware of no law of the United States that can prevent a merchant or ship owner selling his vessel and cargo (should the latter even consist of warlike stores) to a citizen or inhabitant of Buenos Ayres or any part of South America, nor will it, do I think, make any difference whether such sale be made directly, in a port of the United States, with immediate transfer and possession thereupon; or under a contract entered into here with delivery to take place in a port of South America." 1 Op. Atty. Gen. p. 190 (July 27, 1816). Thereupon the president called the attention of congress to the subject, that they might, if they

thought expedient, legislate afresh in the matter. The debates which followed were long, warm, and animated. There can be no question but that the matter was thoroughly discussed, and the conclusion was the deliberate judgment of congress upon the policy which it behooved the United States to maintain. The history of the debate is important. A bill was introduced, entitled "A bill to prevent citizens of the United States from selling vessels of war to the citizens or subjects of any foreign power, and more effectually to prevent the arming and equipping vessels of war in the United States, intended to be used against nations in amity with the United States." The first section of this bill enacted, "that if any citizen of the United States shall, within the limits of the same, fit out, &c., any private ship or vessel of war, to sell the said vessel or contract for the sale of the said vessel, to be delivered in the United States or elsewhere, to the purchaser with intent or previous knowledge, that the said vessel shall or will be employed to cruise or commit hostilities, &c.; such person so offending shall, on conviction thereof, be adjudged guilty, &c." This bill emerged from the hands of our national legislators so wonderfully shorn of its important features as to be scarcely recognizable. Congress did not propose to take away, or in any degree to trammel, the full right, as it then existed, of dealing in vessels of war. So the phrases about "selling vessels of war" disappeared equally from the title and the body of the act which was finally passed in 1817. Neither did it escape the keenness of the statesmen who were engaged in the discussion, that this right of sale would be, as Judge Nelson said, a "mere nullity," if the "previous knowledge" of the seller that the vessel "will be employed" to cruise, &c., were allowed to remain a part of the law. They were resolved to retain the right of sale as a practical right. So when they struck out the words which forbade a sale, they also struck out these words about "knowledge" which would otherwise have been potent wholly to frustrate an essential object of the legislation. The codification in the following year, 1818, constituting the present law, left this matter unchanged. In 1822, the whole subject being still freshly remembered, Judge Story delivered the famous opinion in the case of The Santissima Trinidad, 7 Wheat. [20 U. S.] 283. This sustained the legality of sales of war vessels to one of two belligerents, with the other of whom we were at peace. This has ever since been considered the leading case on the subject. Ten years later, in 1832, it was followed and affirmed in U. S. v. Quincy, 6 Pet. [31 U. S.] 445. Since then, there has been no adjudication until this Meteor Case arose.

In comparing the case of the Meteor with those of the Anglo-Confederate cruisers in connection with this principle that a naked sale is legal if unaccompanied with circumstances showing an illegal intent, we must again seek for a clear exposition of the law, in a quotation from Judge Nelson. He said, "It is impossible to say that these owners of the Meteor took any interest in co-operating with or aiding the Chilian government in war with Spain, or are connected with that idea." Also, we would refer again to his remark previously quoted, that if a vessel were built under a contract made with the agents of a belligerent government, then suspicion would rest upon her from the very inception. In these words of the learned justice, the whole distinction lies as in a nutshell. Precisely those essential circumstances indicative of an illegal intent which were absent in the case of the Meteor, were notoriously present in the cases of the rebel cruisers. Some, at least, of these, were built by a contract, with agents of the Confederate government, and according to specifications furnished by these agents. The English builders, owners, and sellers of all of them certainly "took an interest in co-operating with and aiding" the rebels "in war with" our government, and were "connected with that idea." It was by their

aid, or rather by their sole action, that the armament and munitions of war, the stores and supplies, were placed on board, and the crews were enlisted and shipped. It is on these very facts that we base our demands. The Alexandra was built in pursuance of a contract with, and according to directions furnished by, Confederate agents. The Alabama sailed from Liverpool to a small port near Holyhead; there took in a part of her fighting crew, which had been enlisted in Liverpool; thence sailed to the Azores, and there took in her armament, which was brought to her by two vessels from Liverpool. The Georgia, or Japan, sailed from Greenock, to a small French port in the channel, whither her armament, officers, and crew were brought out to her from Liverpool. The Shenandoah, or Sea King, sailed from London to Funchal, and there received her armament and crew from a steamer which brought them to her from Liverpool; sailing from that port at the same time that she sailed from London. It seems hardly necessary to point out the particulars in which the facts in all these cases transcend the facts in the Meteor Case. In each one of them, the guilty intent is clear. In no one of them did the transaction bear any resemblance to a simple matter of outright bargain and sale. There was "co-operation."—active, essential, and important "co-operation" and "aid,"—furnished by the sellers to the buyers, up to the very moment when these vessels were completed fighting ships of the Confederate "navy." The English parties intended to do, and actually did, more than merely dispose of ships for cash, after the fashion of the ordinary and innocent sale which was at one time projected by the owners of the Meteor; but which Judge Nelson found that they failed to accomplish. The English vendors lent active, efficient, and indispensable assistance to the rebel vendees, up to the very point of cruising in the vessels themselves. They only stopped short of becoming actual combatants. They were partners in the proceeding up to the very moment when the vessels began to burn and destroy. They took the active part in all the previous undertakings. They built the ships by contract and under directions; they made the arrangements for their departure, and for the simultaneous departure and safe transportation and sure transfer of the munitions and crew, upon receipt of which the vessels were at once in fighting trim. If these circumstances do not constitute proof of an "intent" such as that designated in the statute, then the United States has no case against England; and if they do not show an intent utterly different from an intent to sell outright for cash a wholly unequipped ship, long since built for most honorable purposes, and there to drop all connection with her, then there is no precision or intelligibility in language.

We have forborne to criticise the opinion rendered by Judge Betts, because we have not intended so much to criticise as to narrate. But it is a suggestive fact, that at the trial before Judge Nelson, the district attorney put it in as his brief in the case, because, as he said, it "puts it in a better manner than I can do." Judge Nelson simply rendered a short decree reversing that of Judge Betts, on the ground that the evidence did not sustain the allegations of the libel. The government gave notice of their intention to appeal to the supreme court of the United States, but have since withdrawn their appeal. So the case is closed with the decree of Judge Nelson. Under these circumstances it is to be regretted that his honor did not see fit to write an elaborate opinion discussing both the law and the facts in the case, which must have been of very great value, by reason of the peculiar fitness of Mr. Justice Nelson to adjudicate in causes of this nature. The quotations which we have made, are from his rulings at the hearing before him, and are, of course, much less elaborate than could have been expected in an opinion.

Judge Betts suggested a melancholy consolation for the owners, when he refused to bond the vessel. He said, in case of acquittal, congress might see fit to compensate them for their injuries and losses unjustly incurred. It is not a cheerful prospect for men who have lost money enough to ruin a prosperous merchant, to be remitted to the uncertain success, and the certain vexation, labor, expense and delay, attendant upon the effort to secure reimbursement by a private bill in congress. A rich man might well be utterly ruined if his vessel is to be kept rotting at the wharf, while his case is slowly passing through the many stages of litigation which precede the final judgment. The power of the informer to levy black-mail in such a case is enormous, and wholly disproportioned to the power which it has been deemed safe to allow him in any other class of government prosecutions. We should incline, as a question of law, to consider the argument of Mr. Evarts as conclusive to the effect that bonding is, at least, a matter of discretion, if not of obligation. But the point is a doubtful one and the first action of Judge Betts certainly affords a precedent for holding that bonding is not even permissible. These facts seem to suggest the advisability of some supplementary legislation which should place this important matter upon a certain and a just ground. It would be easy to declare that bonding shall be either obligatory or discretionary, as shall seem good. Also, it would seem quite worthy of a fatherly government to provide some better means than the alarming prospect of an appeal to congress for reimbursing a citizen whom the law declares innocent, and who has, in the course of the litigation which has led to this conclusion, lost, it may be, some hundreds of thousands of dollars. The hardship in these cases is not only vastly greater in degree, but it is entirely different in kind, from the hardship suffered in ordinary cases of governmental prosecution of men, finally found innocent; and seems to admit and to demand some recognized method of restitution, at least, for the injury inflicted upon their property. Such restitution would still leave them, like other men acquitted in government suits, to bear their own costs of court and counsel fees; a rule which is equally unjust and universal, and which it would be hopeless to try to change. But if a ship, worth $200,000 or $300,000, had grown so unseaworthy, that at the close of the trial, she was worth only $50,000 or $25,000, her innocent owner ought certainly to have a surer and an easier remedy than the privilege of lobbying a private bill through congress.